Jason McGEHEE *v*. STATE of Arkansas

CR 00-760 72 S.W.3d 867

Supreme Court of Arkansas
Opinion delivered April 25, 2002

*Sam T. Heuer*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Jason McGehee appeals the trial court's denial of his petition for postconviction relief. His prior appeal from the denial of his petition for postconviction relief was reversed and remanded for the trial court to make the specific findings of fact and conclusions of law required under Ark.

R. Crim. P. 37.5, and due to a flagrantly deficient abstract. *McGehee v. State*, 344 Ark. 602, 43 S.W.3d 125 (2001). McGehee's convictions on capital murder and kidnapping, and respective sentences of death and life imprisonment, were affirmed in *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999) ("*McGehee I*").

McGehee asserts five separate errors by counsel that he alleges required the trial court to find he is entitled to relief under Rule 37. More particularly, McGehee asserts ineffective assistance of counsel in: 1) failure to request a jury instruction declaring that Candace Campbell and Robert Diemert were accomplices to the capital murder; 2) failure to seek a similar ruling from the trial court as a matter of law; 3) failure to raise the issue of the constitutionality of his sentence given that others similarly involved were sentenced to lesser terms; 4) failure to raise on direct appeal the issue of the denial of transfer where co-defendant Benjamin McFarland had just been convicted of Melbourne's murder in Baxter County; and 5) abandonment of the issue of consideration of victim-impact evidence in the sentencing phase.

We find no reversible error and affirm the denial of the petition for postconviction relief.

*Facts*

This case arose from the murder of fifteen-year-old John Melbourne, Jr. In August of 1996, Melbourne was acquainted with Jason McGehee, Benjamin McFarland, Christopher Epps, and Candace Campbell, all of whom were older than he was. They were occupying a house in Harrison and ranged in age from seventeen to twenty-one years old. The facts show that McGehee was the twenty-one-year-old and the leader of the group.

McGehee moved into the house in Harrison while it was still being rented by Robert Diemert. However, Diemert moved shortly thereafter and ceased paying rent. Nonetheless, McGehee remained in the house, and the others moved in with McGehee. Melbourne stayed the night there occasionally. There was no power at the house, and the group apparently financed their

purchase of food, alcohol, and drugs by stealing property and passing stolen checks.

On August 19, 1996, Melbourne was sent by McGehee to obtain cash by providing a stolen check made out for more than the amount required to purchase shoes. Melbourne made two attempts at Cooper Store in Harrison and was able to purchase shoes on the second attempt. The store owner became suspicious and called the bank. Upon determining that the check was stolen, the store owner called police who picked up Melbourne and Anthony Page and questioned them. Melbourne told the officers about stolen property and checks that could be found at and near McGehee's house. Melbourne was then released into his father's custody but was soon back on the streets in downtown Harrison.

Police proceeded to the house where they attempted to contact those living there. No one answered the door, and according to Christopher Epps's testimony, the police proceeded directly to the stolen items including the stolen checks under the house. The police located the stolen property. This activity by police was observed by McGehee and the others who were hiding inside the house.

Later that night, John Melbourne, Jr., was murdered. The facts show escalating events that commenced with the visit by police and culminated with Melbourne's death.

After the police left upon finding the stolen goods, the group at the house agreed that Melbourne had "snitched." The facts show that the group then agreed that Melbourne needed to be taught a lesson. They decided that upon Melbourne's return, they would beat him to teach him not to "snitch."

Anthony Page testified that the group was always talking about beating someone. McFarland and Epps found Melbourne in town and asked him to return to the house, which he did. Upon his return, Melbourne was attacked by Epps as he spoke with McGehee about his arrest. Then McGehee began to beat Melbourne as well. At this point, Melbourne was being beaten with fists and also being kicked. McFarland joined in, as did Campbell. Melbourne was stripped naked, and the assault continued. There

was some evidence that Campbell sprayed him in the face with Lysol and burned him with a candle.

This initial beating lasted about an hour and a half or possibly two hours. The evidence fails to show that there was any discussion of killing Melbourne throughout this time. The first mention of death in the evidence comes shortly thereafter from a conversation between McGehee and Charla Bright. Bright was their neighbor who came over twice as she heard the noises of Melbourne being beaten. She observed Melbourne as he was being assaulted. She testified that she was later assured by McGehee that Melbourne would not be hurt. However, she also testified that MeGehee told her that if this had occurred in a bigger city, he would be killed for what he had done. McGehee told her Melbourne had "narked them out."

The next mention of death was in a car on a trip to Utah that included a stop in Omaha, Arkansas. The trip was undertaken because both McGehee and Epps were wanted by the police and were now more fearful of arrest because of the police visit to their home. According to Epps's testimony, they overheard the police use their names while hiding from the police in the house as the police searched for the items they were told of by Melbourne. Near the close of the two-hour beating, Diemert arrived. He had a car. Diemert testified that McGehee had discussed moving to Utah with him previously, and when McGehee suggested that they go that night, he agreed.

By the time Diemert arrived, McGehee had allowed Melbourne to put his shirt and shorts on. Diemert testified that as they loaded the car he was unaware that Melbourne had his hands bound. Bright testified she heard the group leave that night.

They then left for Utah, but headed first for a house in Omaha that McGehee's uncle had rented until recently. According to Campbell's testimony, she understood they were going to the house in Omaha to leave McFarland, Epps, and Melbourne there. According to Epps's testimony, they were going to leave Melbourne there.

Campbell testified that during the ride to Omaha, she was sitting in McGehee's lap in the front passenger seat, and someone in the back seat asked Melbourne how it felt to know he was going to die. Again, according to Campbell's testimony, upon their arrival in Omaha, they took Melbourne in the house there. He was stripped naked again, and the assault on Melbourne began again. Everyone present was engaged in the assault on Melbourne. According to Diemert, Melbourne was kicked, hit with fists, hit with a box fan, and struck with a piece of wood used like a bat. Diemert also testified that a butcher knife was placed at Melbourne's throat. According to Epps's testimony, the butcher knife was placed at Melbourne's stomach. Diemert further testified that Campbell kicked and then burned Melbourne's genitals with a candle. Campbell testified that during this beating McGehee asked Melbourne how it felt knowing he was going to die. Melbourne attempted escape but was grabbed and brought back.

It appears the group decided to take a break from their brutal assault, and they went outside to have a smoke. According to Campbell's testimony, Epps was guarding Melbourne while the rest talked outside. Again, according to Campbell, McGehee asked McFarland if he was going to take care of Melbourne, which Campbell understood meant they intended to kill him. She testified that McFarland was hesitant, but that McGehee was suggesting they get rid of Melbourne. Campbell testified further that then she and Diemert were told to go wait in the car, which they did. Diemert testified that McGehee led Melbourne down a path into the woods. McFarland and Epps followed along. At this time, Melbourne again had his hands bound and had not been allowed to dress. Again according to Diemert, the three returned about thirty minutes later without Melbourne.

*Standard of Review*

McGehee's conviction and sentence were affirmed by a decision of this court handed down June 17, 1999. Pursuant to Ark. R. Crim. P. 37.5(k) "Special Rule for Persons Under Penalty of Death," Rule 37.5 is applicable to McGehee because he became eligible to file a petition under Rule 37.2(c) after March 31, 1997.

A five-page order setting out findings of fact and conclusions of law is provided. Therein, the trial court discusses each issue raised by McGehee and makes specific findings and conclusions. The trial court denied McGehee's petition.

Where ineffective assistance of counsel is asserted, the reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Thomas v State*, 330 Ark. 442, 954 S.W.2d 255 (1997). In order to rebut this presumption, the petitioner must show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt, i.e., that the decision reached would have been different absent the errors. *Id.* A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* In determining a claim of ineffectiveness, the totality of the evidence before the factfinder must be considered. *Chenowith v. State*, 341 Ark. 722, 19 S.W.3d 612 (2000). This court will not reverse the denial of postconviction relief unless the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Green v. State*, 343 Ark. 244, 33 S.W.3d 485 (2000).

To prevail on a claim of ineffective assistance of counsel, McGehee must show that counsel's representation fell below an objective standard of reasonableness and that but for counsel's errors, the result of the trial would have been different. *Kemp v. State*, 347 Ark. 52, 60 S.W.3d 404 (2001) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

*Failure to Request Jury Instruction or seek a Determination as a Matter of Law that Campbell and Diemert were Accomplices*

McGehee's first two assertions of ineffective assistance of counsel — the failure to request a jury instruction declaring Campbell and Diemert were accomplices to the capital murder or the failure to seek a similar ruling from the trail court as a matter of law — are so closely related that we will discuss both assertions together.

The State relied heavily upon the testimony of Campbell and Diemert in its proof of the capital murder. As this court stated in

its opinion on McGehee's direct appeal, the trial court instructed the jury that Epps was an accomplice to the capital murder as a matter of law, and that Epps, Campbell, and Diemert were accomplices to the kidnapping as a matter of law. *McGehee*, 338 Ark. at 160. However, as this court also noted, it is not apparent from the record that McGehee ever requested that Campbell and Diemert be declared accomplices with respect to the capital-murder charge as a matter of law or that the issue be submitted to the jury. This court held McGehee was procedurally barred from pursuing this issue on appeal, and McGehee now argues this failure was ineffective assistance of counsel requiring relief under Rule 37. More specifically, McGehee argues that this constitutes a failure to preserve a challenge to the sufficiency of the evidence and, as such, is a proper ground for postconviction relief, citing *Thomas v. State*, 322 Ark. 670, 911 S.W.2d 259 (1995).

██ ██ If Campbell and Diemert had been found to be accomplices either by the court or by the jury, their testimony would have required corroboration. A person cannot be convicted of a felony based upon the testimony of an accomplice, unless that testimony is "corroborated by other evidence tending to connect the defendant with the commission of the offense." Ark. Code Ann. § 16-89-111(e) (Supp. 2001); *McGehee, supra*. We must then determine whether Campbell and Diemert were accomplices. The law is well settled that a witness's status as an accomplice is a mixed question of law and fact. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002); *King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996); *Hummel v. State*, 210 Ark. 471, 196 S.W.2d 594 (1946). However, when the facts show conclusively that the witness was an accomplice, the issue may be decided as a matter of law. *King, supra*. When the accomplice status instead presents issues of fact, the question is submitted to the jury. *Id*. The trial court was never asked to declare Campbell and Diemert accomplices nor to submit the issue to the jury. McGehee argues that his counsel's failure to do so constitutes ineffective assistance of counsel because if the testimony of Epps, Campbell, and Diemert is excised, there is no direct or circumstantial evidence to link McGehee to the murder scene.

Before we discuss the status of Campbell and Diemert, we must note that McGehee's argument is based on an assumption that death was inflicted by strangulation by McGehee, Epps, and McFarland after they led Melbourne down the path into the woods.

In *McGehee I* we stated at 158:

> The beating initially occurred at Appellant's house in Harrison and later continued at Appellant's uncle's house in Omaha, Arkansas. After having beaten the boy for approximately two hours, Appellant, McFarland, and Epps took Melbourne out behind the house in Omaha, into a wooded area, and strangled him.

At page 166 we stated:

> Dr. Charles Kokes, an associate medical examiner at the State Crime Laboratory, performed an autopsy on Melbourne's body, which was severely decomposed. Dr. Kokes testified that there was evidence of trauma to Melbourne's skull. Particularly, he found numerous small fractures on the front of the cranium, around the nasal apeture, on the left cheekbone, and near the left orbit, the bony depression that houses the eyeball. Additionally, there were two traumatic indentions on the right side of the front of the skull. Dr. Kokes stated that the fractures were indicative of blunt force being used on the victim, and that the injuries he observed would be consistent with multiple beatings over a long period of time by persons using fists, feet, and various other devices. Dr. Kokes indicated that the manner of Melbourne's death was homicide, and that the blunt-force injuries to the victim's head played a part in his death.

> [FN 1] Dr. Kokes was not able to examine the body for evidence of strangulation, as the soft tissue around the neck had already completely decomposed.

Campbell was present at the beating in Harrison, and both Campbell and Diemert were present at the beating in the house in Omaha. Diemert was present in Harrison, but it appears he arrived there after the beating had ceased. Neither was present at the events in the woods. McGehee's reliance on death by strangulation as the only cause of death is in error. Dr. Charles Kokes's initial opinion in this case was that death was caused by blunt-

force head injuries and strangulation. Dr. Kokes further testified that the body was so decomposed that there was no soft tissue evidence of strangulation in this case, and strangulation was included in his opinion based on investigative material he was given. He testified that the bony injuries that they would normally look for to indicate strangulation were not present. According to Dr. Kokes, this was likely a consequence of Melbourne's young age. More specifically, Dr. Kokes's testified, "Concerning the cause of death, we know that there was infliction of blunt force trauma to the head and face area." Thus, the expert evidence as to the cause of death was the blunt force trauma to the head and face area.[1]

Those who inflicted the blunt-force trauma to Melbourne's face and head caused or played a part in his death. The question in this case is whether Campbell and Diemert were accomplices to McGehee in causing Melbourne's death. Under Ark. Code Ann. § 5-2-403 (Repl. 1997), an accomplice is defined as follows:

> (a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:
> (1) Solicits, advises, encourages, or coerces the other person to commit it; or
> (2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or
> (3) having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.
> (b) When causing a particular result is an element of an offense, a person is an accomplice in the commission of that offense if, acting with respect to that result with the kind of culpability sufficient for the commission of the offense he:
> (1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the result; or

---

[1] We note that in *McFarland v. State*, 337 Ark. 386, 391, 989 S.W.2d 899 (1999), we stated that "Epps, McFarland, and McGehee took turns strangling Melbourne until he died," and that "McFarland admitted that he was the one strangling Melbourne with an orange cord when he expired." Benjamin McFarland was a co-defendant of McGehee's. However, in *McFarland* there is no discussion of Dr. Charles Koke's testimony. Dr. Kokes performed the autopsy on Melborne's body.

(2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the result; or

(3) Having a legal duty to prevent the conduct causing the result, fails to make proper effort to do so.

This statute was enacted by Act 280 of 1975. In *Wilson & Dancy v. State*, 261 Ark. 820, 827-828, 552 S.W.2d 223 (1977), this court stated that an appropriate definition of accomplice was found in *Simon v. State*, 149 Ark. 609, 233 S.W. 917 (1921), and quoted in *Burke v. State*, 242 Ark. 368, 373-374, 413 S.W.2d 646(1967):

> The test, generally applied to determine whether or not one is an accomplice, is, could the person so charged be convicted as a principal, or an accessory before the fact, or an aider and abetter upon the evidence? If a judgment of conviction could be sustained, then the person may be said to be an accomplice; but, unless a judgment of conviction could be had, he is not an accomplice.
>
> \* \* \* \* \*
>
> The term 'accomplice' cannot be used in a loose or popular sense so as to embrace one who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related, but distinct offense.
>
> To constitute one an accomplice, he must take some part, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice. Nor can the concealment of knowledge, or the mere failure to inform the officers of the law when one has learned of the commission of a crime.

In *Atkinson, supra,* this court noted that presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. In *Atkinson, supra,* this court stated:

> Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity of a

crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. Id. A defendant is an accomplice so long as the defendant renders the requisite aid or encouragement to the principal with regard to the offense at issue, irrespective of the fact that defendant was not present at the murder scene and did not directly commit the murder. *See Sumlin v. State*, 273 Ark. 185, 618 S.W.2d 372 [617 S.W.2d 372] (1981) (holding that it is irrelevant that Sumlin, who was in jail at the time of the murder, did not pull the trigger, if he aided, solicited, or encouraged his wife, Ruth Sumlin, in committing the murder).

347 Ark. at 347.

In its Findings of Fact and Conclusions of Law on the Rule 37 petition, the trial court erred when it found that counsel was not ineffective in failing to submit the issue of the accomplice status of Campbell and Diemert to the court or to request a jury instruction on the issue. There was sufficient evidence to submit the issue of accomplice liability to the jury as to Campbell and Diemert had counsel requested a jury instruction. Both Campbell and Diemert were friends with McGehee. Both were present and could see that Melbourne was deprived of his freedom and was being subjected to physical assault. Campbell was present both at the beating in Harrison and at the beating in Omaha. Diemert was present in Harrison just after the beating ceased there and present in Omaha. Campbell and Diemert were present in the car when someone in the back asked Melbourne how it felt to know he was going to die, and both were present at the Omaha house when McGehee asked Melbourne during the beating how did it feel knowing he was going to die. Standing alone, that would constitute sufficient facts, but by their own admission both participated in the beating of Melbourne to some extent. The evidence of the degree of their involvement was in question, and the issue should have been submitted to the jury, had counsel so requested. This court has stated that the question must be presented to the jury where there is any evidence to support a jury's finding that the witness was an accomplice. *Bradford v. State*, 325 Ark. 278, 927 S.W.2d 329 (1996); *King, supra.*

■ Even though we hold that the issue of accomplice liability should have been submitted to the jury, had counsel so requested, relief under Rule 37 is not required. Even if Campbell and Diemert had been found accomplices by the jury, their testimony was corroborated. The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Henderson v. State*, 337 Ark. 518, 990 S.W.2d 530 (1999). Corroborating evidence must be sufficient standing alone to establish the commission of the offense and to connect the defendant with it. *Gordon v. State*, 326 Ark. 90, 931 S.W.2d 91 (1996). *See also, Hogue v. State*, 323 Ark. 515, 915 S.W.2d 276 (1996); *Daniels v. State*, 308 Ark. 53, 821 S.W.2d 778 (1992); *Andrews v. State*, 305 Ark. 262, 807 S.W.2d 917 (1991).

■ ■ In *Gordon, supra*, this court noted that the corroborative evidence must be substantial evidence, which is stronger evidence than that which merely raises a suspicion of guilt. *Gordon, supra; Hogue, supra.* Circumstantial evidence qualifies as corroborating evidence but it, too, must be substantial. *Gordon, supra.* But corroboration need not be so substantial in and of itself as to sustain a conviction. *Id. See also, Rhodes v. State*, 280 Ark. 156, 655 S.W.2d 421 (1983). In *Henderson v. State*, 279 Ark. 435, 440-441, 652 S.W.2d 16 (1983), this court stated:

> Corroboration must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with the crime and not directed toward corroborating the accomplice's testimony. *Olles v. State*, 260 Ark. 571, 573, 542 S.W.2d 755, 758 (1976), citing *Yates v. State*, 182 Ark. 179, 31 S.W.2d 295 (1930). In addition to being substantive, the corroborating evidence must be substantial. *Olles*, at 573, 542 S.W.2d at 757. Substantial evidence is stronger evidence than that which merely raises a suspicion of guilt. It is evidence which tends to connect the accused with the commission of the offense charged. However, it is something less than that evidence necessary in and of itself, to sustain a conviction. *Olles*, at 573, 542 S.W.2d at 757-58; *Klimas v. State*, 259 Ark. 301, 534 S.W.2d 202 (1976). The corroborating evidence may be circumstantial, but it must be of a material nature and legitimately tend to connect the

accused with the commission of the crime. *Pollard* at 756, 574 S.W.2d at 658, citing *Roath v. State*, 185 Ark. 1039, 50 S.W.2d 985 (1932). Corroboration may be furnished by the acts, conduct, declarations or testimony of the accused. *Olles*, at 574, 542 S.W.2d at 758. False statements to the police and flight by an accused may constitute corroborating evidence. *Bly*, at 619-20, 593 S.W.2d at 454.

The evidence does not have to be sufficient to sustain the conviction but it must, independent from the testimony of accomplices, tend to a substantial degree to connect the defendant with the commission of the crime. *Rhodes v. State*, 276 Ark. 203, 634 S.W.2d 107 (1982); *King v. State*, 254 Ark. 509, 494 S.W.2d 476 (1973). Moreover, corroboration can be provided by the acts, declarations, or testimony of the accused. *Barnett v. State*, 346 Ark. 11, 53 S.W.3d 527 (2001). *Daniels, supra.*

Evidence of the events in Harrison came from witnesses other than Campbell, Diemert, and Epps. Charla Bright lived next door to the home Jason McGehee and the others were occupying. She testified she knew both McGehee and Melbourne. According to her testimony, on the afternoon of August 19, she was in her bedroom and heard thumping on the wall in the house next door. She went over to see what was going on but was not let in. She returned to her home, but still heard the same noises. Bright went back, and this time she stuck her foot in the door and used her hip to force the door open some. She saw they had Melbourne up against a wall, and McFarland and Epps were hitting and kicking him. Bright asked Campbell why this was happening and she responded, "Don't worry about it, you're just going to get yourself into trouble." McGehee then came to the door and told Bright, "Don't worry about it, he's our 'homey,' we're not going to hurt him." She further testified that McGehee told her that if they "were in a bigger city, he'd be killed for what he's done. . . he's our friend and we're just going to teach him a lesson." Again according to Bright's testimony, soon thereafter McGehee came over to Bright's house and told her not to worry about it, that Melbourne was his "homey," and that they were not going to hurt him. McGehee assured her that Melbourne was their friend and that they were just going to teach him a lesson. Later that

same evening, Bright, Epps, and McFarland drove into town looking for drugs. According to Bright's testimony, McFarland and Epps discussed the kicks they were giving Melbourne, whether they were "good or not and how hard. . . ."

There was also testimony from Anthony Page that connected Melbourne and McGehee. There was also testimony from Mandy Trice that Melbourne spent time in the company of McGehee. Page also testified that on August 19, 1996, he went with Melbourne to the shoe store to cash the stolen check and was subsequently arrested along with Melbourne. Page further testified that he knew that the check was stolen because it was on the same account as a check that he had previously cashed for McGehee. Page also testified that on the night that he and Melbourne were arrested, Page was approached by McFarland on the town square. Page testified that McFarland told him that Melbourne had snitched on them, and that they had him at the house where "he was in the process of getting the worse [sic] ass beating of his life." According to Page, McFarland then asked Page if he wanted to help, which he declined to do.

Page also testified that he did not wish to go to McGehee's house at that point out of fear because he, too, had given information to the police and because "all they ever talked about was beating people's asses." Page additionally testified to an event a week or so before where he was asked to take McGehee, McFarland, Melbourne, and a man named Clinton Spears to an outlying area to smoke marijuana. However, when they got there Spears was beaten for snitching, and McGehee made multiple threats that he wished to kill Spears. Further evidence was provided in the property receipt given to Melbourne by the police when they took the shoes he'd purchased, which were found in the home in Harrison, and which bore McGehee's finger print.

The testimony of Page and Bright established that Melbourne was beaten in the house in Harrison because he had "snitched." Thus, the beating was established as an intended act, and both Bright and Page put McGehee in the house and established a relationship between McGehee and Melbourne. *See Stickley v. State*, 294 Ark. 44, 740 S.W.2d 616 (1987). Addition-

ally, "proof of ill will and threats" is sufficient to corroborate an accomplice's testimony. *Sargent v. State*, 272 Ark. 336, 339, 614 S.W.2d 503 (1981); *Roberts v. State*, 96 Ark. 58, 131 S.W. 60 (1910). Bright testified that McGehee told her that had Melbourne "snitched" on his cohorts in a big city, he would have been killed. According to Page's testimony, he was present when McGehee beat up Spears for "snitching," and again according to Page's testimony, McGehee voiced threats to Spears that he wanted to kill him.

Additional evidence places McGehee in the house in Harrison and in the house in Omaha. According to Bright's testimony, she heard them leave the house in Harrison. The next day, McGehee and the others were gone. According to Epps's testimony, McGehee and Epps wanted to leave Arkansas because of outstanding warrants. McGehee wanted to go to Utah and wanted Diemert to take him there. Just as the accomplices testified, McGehee and Diemert, as well as others, were arrested in Utah. McGehee was charged with crimes there. There is evidence McGehee was in the house in Harrison on August 19 and that he was in Utah a few days later. There was also the testimony of Charles McMahan, who owned the property where Melbourne was killed. He testified that he had rented the property to a man named McGehee in the winter of 1995–1996, but that by summer no rent was being paid. This is consistent with the testimony that McGehee directed Diemert to drive the group out to an isolated farm his uncle had previously rented. There is also testimony from accomplices that Melbourne was stripped naked and beaten both in Harrison and in Omaha. According to Dr. Kokes's testimony, the body recovered bore no clothing.

Thus, aside from the testimony of accomplices, there was evidence of a material nature that legitimately tended to connect McGehee with the commission of the crime. Therefore, even if Campbell and Diemert had been found to be accomplices, their testimony would have been corroborated by other evidence tending to connect McGehee with the commission of Melbourne's murder. Neither the failure of counsel to request a jury instruction declaring Campbell and Diemert accomplices to the capital murder, nor the failure to seek a similar ruling from the

trial court as a matter of law requires relief under Rule 37 because this failure did not make any difference in the result of the trial. *See Strickland, supra; Thomas, supra.*

### Sentence of Other Defendants to Lesser Terms

 McGehee alleges that there was equal culpability on the part of McFarland, Epps, Campbell, and Diemert. He notes that while McFarland and Epps received a sentence of life without parole for the murder, Campbell received a sentence of twenty years, and Diemert received a sentence of ten years, he received the death sentence. The argument is flawed in that neither Campbell nor Diemert were charged, tried, or sentenced for murder. In any event, such an argument has been rejected by this court. The issue is whether the imposition of the death penalty is arbitrary. *Heard & Ferguson v. State*, 272 Ark. 140, 612 S.W.2d 312 (1981). In *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), we noted that we no longer required proportionality reviews of death sentences, citing *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995), and noting our discussion in *Williams v. State*, 321 Ark. 344, 902 S.W.2d 767 (1995), where we stated that a comparative-proportionality review is not constitutionally mandated in every case where the death sentence is imposed, citing *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). We went on to note that our legislature, by enacting recent sentencing procedures, has provided a statutory check on arbitrariness by requiring a bifurcated proceeding where the jury is provided with information on aggravating and mitigating circumstances, and with standards in the use of that information. *See* Ark. Code Ann. §§ 5-4-103, 5-4-603 — 605 (Repl. 1997 and Supp. 2001).

### Failure to Appeal the Trial Court's Denial of the Motion for a Change of Venue

McGehee asserts his appellate counsel was ineffective for failure to argue on direct appeal that the trial court erred when it denied his change-of-venue motion. Venue had already been moved once from Boone County to Baxter County, but McGehee claims he should not have been tried in Baxter County because McFarland had just been tried there four months before.

■ The trial court found that in the Rule 37 hearing, McGehee made no showing of prejudice in the trial in Baxter County. The trial court further found there was no showing that the jury panel had any information about the pending charges against McGehee. McGehee argues prejudice because McFarland was tried in Baxter County just four months before him. McGehee then references two affidavits of community members who opined that McGehee could not receive a fair trial, as well as newspaper articles his counsel presented to the trial court. In short, McGehee offers no evidence of actual prejudice by any juror. This court in *Bell v. State*, 324 Ark. 258, 920 S.W.2d 821 (1996), found that *voir dire* of the jury provides adequate safeguards against pretrial publicity. Here there is no evidence *voir dire* revealed anything other than a jury committed to giving McGehee a fair trial and following the instructions of the court. Thus, there was no showing of an abuse of discretion by the trial court in the denial of the motion, which is required for a reversal. *Hill v. State* 331 Ark. 312, 323, 962 S.W.2d 762 (1998). There is no merit to a claim of ineffective assistance of counsel on the failure to raise the denial of the change-of-venue motion on the direct appeal.

### Victim Impact

McGehee argues his counsel was ineffective in failing raise the issue of the constitutionality of victim-impact evidence on direct appeal. McGehee challenges the constitutionality of Act 1089 of 1993, alleging it is void for vagueness because it requires a jury to consider victim-impact evidence under Ark. Code Ann. § 5-4-602(4) (Repl. 1997) in the context of weighing aggravating and mitigating circumstances under Ark. Code Ann. § 5-4-603 and § 5-4-604. He also argues that it gives insufficient guidance to the jury and judge. McGehee also discusses the use of victim-impact testimony to prove aggravating factors. McGehee then refers to an additional aggravating circumstance submitted to the jury, which is a reference to the victim-impact testimony.

■ The arguments as presented have already been presented to this court and rejected. *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998). Again, on the argument presented, this

court has already found victim-impact evidence relevant and admissible on this matter at issue here regarding whether the death penalty should be imposed. *Lee v. State*, 327 Ark. 692, 703, 942 S.W.2d 231 (1996). Speaking generally, in *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995), we upheld the underlying constitutionality of victim-impact testimony. *See Nooner*, 322 Ark. at 322-23, 907 S.W.2d at 688-89 (citing *Payne v. Tennessee*, 501 U.S. 808 (1991)). This decision has been reaffirmed since. *Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000); *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000). Based on the arguments presented, the admission of the victim-impact evidence in this case was consistent with prior case law. Thus, under these facts and arguments there is no merit to the claim of ineffective assistance of counsel.

Affirmed.

IMBER, J., not participating.