

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CR–16–830

| | |
|---|---|
| JAMES ELIJAH WEST **APPELLANT**<br><br>V.<br><br>STATE OF ARKANSAS **APPELLEE** | **Opinion Delivered:** September 6, 2017<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CR-14-711]<br><br>HONORABLE MARCIA R. HEARNSBERGER, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Chief Judge

James Elijah West was charged with aggravated robbery and first-degree battery for acts committed against Alexander Oliver on October 25, 2014, in the Mountain Pine, Arkansas, house that Oliver shared with his aunt and Virgil Mitchell. West was convicted as charged and was sentenced as a habitual offender to consecutive terms of 180 months' imprisonment. He appeals from the April 20, 2016 sentencing order, contending (1) that there was insufficient evidence to support his convictions and (2) that the trial court erred when it denied his motions to have the jury instructed that two of the witnesses were accomplices as a matter of law. We affirm.

### I. Sufficiency of the Evidence

West first contends that the trial court erred by denying his motions for directed verdict because there was insufficient evidence that he was a principal or an accomplice to either the robbery or the battery. He notes that accomplice testimony is not sufficient

corroboration of another accomplice's testimony and that he was not identified by the victims as a perpetrator. He argues that all witnesses who testified about his participation were interested in the case's outcome and hoped to lessen any harsh consequences for their own involvement. He argues that because Philemon "Casey" Tops, Mahogany Aalseth, and Brendan Campbell were "interested parties who had admitted liability" or had been "somehow involved in aiding those liable," their testimony linking him to the scene should be disregarded. He argues that a cell phone, which allegedly belonged to him, was the only evidence linking him to the crime scene but that there was "no corroboration" regarding the phone and that Tops could have brought it there.

Robbery is committed if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, a person employs or threatens to immediately employ physical force upon another person. Ark. Code Ann. § 5-12-102(a) (Repl. 2013). Aggravated robbery occurs if the person committing the robbery is armed with a deadly weapon, represents by word or conduct that he or she is armed with a deadly weapon, or inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-12-103(a). A person commits battery in the first degree if, with the purpose of causing serious physical injury to another person, the person causes serious physical injury to any person by means of a firearm. Ark. Code Ann. § 5-13-201(a)(8).

A directed-verdict motion is a challenge to the sufficiency of the evidence. When the sufficiency of the evidence is challenged in a criminal conviction, the evidence is viewed

SLIP OPINION

in the light most favorable to the verdict, and only the evidence supporting the verdict is considered. *Lovelace v. State*, 2017 Ark. App. 146, at 6, 516 S.W.3d 300, 304. We will affirm if the verdict is supported by substantial evidence—evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Weighing the evidence, reconciling conflicts in the testimony, and assessing credibility are matters exclusively for the trier of fact—in this case, the jury. *Id.* The jury may accept or reject any part of a witness's testimony. *Id.* Inconsistent testimony does not render proof insufficient as a matter of law, and one eyewitness's testimony is sufficient to sustain a conviction. *Harmon v. State*, 340 Ark. 18, 25, 8 S.W.3d 472, 476 (2000).

At West's trial, there were numerous inconsistencies within the testimony of single witnesses and in their collective testimony about various persons' roles in the crimes. Tops, Aalseth, and Campbell, however, all testified that Aalseth drove West, Tops, and Campbell—as well as her friend Vicki—in Aalseth's car some six miles to Mountain Pine and that she let the three men out at the house.

Tops testified that he went with West and Campbell to Oliver's house to buy marijuana; that Aalseth drove; that Vicki was in the front seat; that Campbell gave directions; and that West had a backpack in the backseat. West, Campbell, and Tops got out at the house, and the females parked down the road while the three men went to Oliver's door and went inside.

SLIP OPINION

Tops testified that he entered the home with West and Campbell to buy marijuana. Pulling a handgun on Oliver and an older man (Mitchell), West told Oliver to show him where the weed was. Tops followed West's instructions to search the house and put things into a black backpack that West had brought. Campbell accompanied Tops. While searching the bedroom for marijuana, Tops grabbed a pair of shoes and put them into the backpack. He then heard a gunshot, ran out the back door with Campbell and West, and asked what happened. West responded, "I shot 'em." Tops ran down the road to a church parking lot, where he was shot at. He jumped into a "trash can" to hide, but "a couple of guys" found him and pistol-whipped him. Campbell, who continued walking, ignored Tops's cry for help. Tops was taken back to the crime scene, was arrested, and was transported to the sheriff's office—where he talked with Investigator Kenny Ford.

In the courtroom, Tops identified West as "Slim." Tops explained various discrepancies in his initial statement at the sheriff's office, later statements, and court testimony:

> I told [Ford] all of the names of the people involved. . . . When I talked to Detective Ford that day I did not tell him the entire truth about what had happened because I did not want to get into trouble. At a later point in time I signed a letter stating that James West was not the shooter. I said that Brendan was the shooter in that letter. That was not the truth. I made that statement because I was threatened. I retracted that statement the same day by writing another letter saying that Brendan was not the shooter. I gave it to an officer at the jail. Everything that I have testified today is the truth and whole truth.

SLIP OPINION

He denied making threats in Oliver's living room to shoot the "older" man, and he said that any testimony by Oliver or Mitchell about the involvement of two black males and no white male (Campbell) would have been a lie.

Aalseth testified that she was charged with aggravated robbery but was released from jail after agreeing to testify truthfully. She testified that she knew nothing of a drug deal when Tops asked if she would drive "somewhere" six minutes away and that she agreed to drive in exchange for gas money. She testified that she never asked what the men were planning to do, that Vicki and she stayed in the car and played with their phones while waiting nearby, and that she drove away when they heard gunshots and saw people running out of the house.

Campbell was a juvenile on October 25, 2014, and was not charged with a criminal offense. He testified that he was walking to his ex-girlfriend's house on October 25 when Tops, his friend and neighbor, asked him if he knew where Tops could buy marijuana. When Campbell replied that he "had a friend who went to this guy in Mountain Pine," Tops said he would take Campbell to the ex-girlfriend's house if he "could get [Tops] some weed." Shortly afterward, Tops and Campbell were picked up in a car that Aalseth was driving. Another female was sitting in the front, and a tall, skinny black man whom Campbell had never met was in the back, holding a backpack. Campbell later learned that the man, called "Slim" at the time, was West.

Campbell further testified that, once in the car, he gave directions to the house in Mountain Pine. Along the way, something that "felt like a gun" was jammed into his rib cage. West told him that if he wanted to live, he should do what West said. When they arrived at the house, West told him to "get the f___ out of the car" and "quit being a pussy." Campbell stayed in the yard when West and Tops went up to the porch. West knocked on the door; kept telling Oliver, "I need some weed"; pulled out a gun; "slammed him in the house"; and ordered him to "get the f___ on the ground." West told Campbell to get inside. Campbell hesitated but walked up to the porch and began opening the screen door. He heard a gunshot and "ran off through the yard" toward the main road. He heard yelling and more gunshots, saw a man he didn't know kicking a "trash can," saw Tops's head "pop up" from the trash can, and saw the man beat Tops's head with a pistol. Tops asked Campbell for help, but Campbell kept walking—trying "to get out of there." At the sheriff's office, Investigator Ford showed him a six-person photo lineup. He picked West's photo.

Oliver and Mitchell testified about details of the battery and robbery. Oliver testified that two men came to the house asking to buy marijuana, that he would not sell or give them any, and that they followed him into the living room where Mitchell was watching television. Oliver and Mitchell testified that the man who was tall and skinny had a gun; that Oliver and Mitchell were ordered to lie on the floor; that the second man told the

armed man to shoot the old one (Mitchell) first; and that Oliver was shot in the stomach when he grabbed for the gun.

Oliver also testified that the armed man had worn a backpack, which Oliver identified at trial as the one Investigator Ford had taken as evidence the day of the crimes. Oliver identified a pair of Nike shoes and a box of shotgun shells, which had been found in the backpack, as belonging to him and having been in the house before the two men entered. Investigator Ford testified that the backpack was located away from the residence; that he found the Nikes inside the backpack when he made an initial, brief search; that when he "revisited" the backpack months later, he discovered a cell phone in its front pocket; and that he obtained a search warrant for the cell phone. Tops testified about text messages and photos that had been extracted from the phone pursuant to the search warrant. He testified that he and West had texted about setting up apartment robberies prior to October 25, that they "did not actually complete any of those robberies," and that the texts did not discuss anything about October 25. Tops identified West and his girlfriend in photos retrieved from the phone.

West moved for a directed verdict at the close of the State's case, arguing that no objective witnesses had placed him at the scene:

> All the testimony placing Mr. West at the scene comes from . . . Mr. Tops, who—. . . based on his being charged—is automatically deemed an accomplice in fact, as opposed to one that the jury would make a determination on.
>
> I'd say that's also true for Mahogany Aalseth as she is presently charged and indicated her charges would be dropped if she testified quote/unquote "truthfully."

SLIP OPINION

> You have Brendan Campbell whose testimony about Mr. West was discredited by other witnesses that were wholly contrary to what he indicated took place. Specifically, . . . being forced to go to the drug house and . . . go in the drug house.

West noted that Oliver had not identified anyone when shown the six-photo lineup containing West's photo and that Mitchell had picked a different person's photo. West further argued:

> The backpack aspect—and I know this is a determination for a jury to make that point—but I don't think that in and of itself when the phone that's found thirteen-plus months later from the date of this incident is enough objective evidence to be an independent corroboration of the witnesses that have testified that Mr. West was at the scene and that he involved himself in pointing a gun at Mr. Alex Oliver and all the other allegations they've made.
>
> I think it's just so incredible that they contradict each other and they're also, in my opinion, accomplices, in which case if that's the only thing you have a directed verdict should be granted in that instance.

The trial court denied this motion for a directed verdict.

The defense then put on its case, which included testimony by the victims' across-the-street neighbor and additional testimony by Investigator Ford regarding the backpack. West renewed his directed-verdict motion at the close of all the evidence, adding,

> [T]here is still an insufficiency of evidence to show beyond a reasonable doubt that Mr. West is guilty of either of these crimes . . . . It's not in the light most favorable to the State at this point, it's whether or not they've actually, to the Court's mind, proven their case and at this point I'd move for that directed verdict on both counts.

The trial court denied the motion for directed verdict.

West does not dispute that Oliver was shot in the stomach and was robbed, but he notes that neither Oliver nor Mitchell identified him as one of the perpetrators. He argues

SLIP OPINION

that the only testimony linking him to the crime scene came from Tops, Aalseth, and Campbell—whom he characterizes as "interested parties who had admitted liability to the offense or having been somehow involved in aiding those liable." He argues that their testimony should be disregarded because accomplice testimony is insufficient corroboration of another accomplice's testimony. He also argues that there was "no corroboration" regarding the cell phone that allegedly belonged to him and tied him to the scene.

Investigator Ford testified that on October 25, 2014, he took photographs and looked for evidence at the crime scene. He found a black backpack outside the house and an expended shell casing in the living room couch. Oliver's shoes were found in the backpack. The evidence that Ford collected was placed into a secure location. While preparing for trial, Ford "revisited" the backpack and found a cell phone in the front pocket, which had not been found in the earlier search. James Martin, a lieutenant at the Garland County Sheriff's Office, testified that he had been trained in downloading content from phones and electronic equipment and was able to extract data from the cell phone located in West's backpack. In some of the recovered texts, Tops and West discussed setting up robberies prior to October 25, 2014.

The issue before us is whether there was substantial evidence to corroborate the testimony of West's accomplice-at-law, Tops, and whether the corroborating evidence tended to connect West to the crimes and whether it independently established the commission of the crimes. The evidence summarized above showed that West, armed with

9

SLIP OPINION

a deadly weapon, along with Tops, forced his way into Oliver's home and demanded marijuana; ordered Oliver and Mitchell to lie on the ground; shot Oliver when he did not produce marijuana; stole a pair of Oliver's shoes and a box of shotgun shells; and ran off after shooting Oliver. There was also evidence from which the jury could conclude that the backpack and the cell phone belonged to West, or at least were used by him, and connected him with the shooting. From these facts, the jury reasonably could conclude that West committed the aggravated robbery and robbery with which he was charged. Further, there was substantial evidence to support a determination that Campbell was not an accomplice, that his testimony tended to connect West to the robbery and battery, and that the testimony independently established the commission of those crimes.

## II.    Jury Instructions

West contends that the trial court erred when it denied his motions to have the jury instructed that Mahogany Aalseth and Brendan Campbell were accomplices as a matter of law. As a threshold matter, we disagree with the State's position that West did not preserve this point for our review. A defendant must either have the trial court declare a witness to be an accomplice as a matter of law or submit the issue to the jury for determination. *Windsor v. State*, 338 Ark. 649, 656, 1 S.W.3d 20, 24 (1999). The issue is not preserved for appellate review when the trial court does not find a witness to be an accomplice and the defendant fails to request that accomplice instructions be submitted to the jury. *Id.*

SLIP OPINION

After the trial court denied West's directed-verdict motions at the close of all the evidence, West renewed two previous motions. First, he renewed "motions pertaining to the [Rule] 404(b) evidence, meaning for the texts and the cell phone, based upon the cell phone as well, but based upon the lack of authentication." The court denied the motion, and the following colloquy took place regarding the second motion:

DEFENSE COUNSEL: And I would renew my motion that the other two witnesses besides Philemon Tops—Mahogany Aalseth and Brendan Campbell—be deemed accomplices as a matter of law as opposed to the jury making that decision.

THE COURT: It that a motion that we took up before trial?

DEFENSE COUNSEL: We took it up at the end of their evidence. But we decided on the jury instructions.

THE COURT: That's denied as well.

West asked the trial court to declare Aalseth and Campbell accomplices as a matter of law rather than let the jury make the determination, and the court denied the request. This preserved for our review the issue of whether proper jury instructions were given.

Regarding Tops, the jury was given AMI Crim. (Arkansas Model Criminal Instructions) 2d 401, entitled *Accomplices–Definitions and Joint Responsibility*:

> In this case the State does not contend that *James Elijah West* acted alone in the commission of the offense. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.

> An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:

11

SLIP OPINION

Solicits, advises, encourages or coerces the other person to commit the offense; or

Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or

Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

### III.    Definition

"Purpose"—A person acts with purpose with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result.

The jury also was given AMI Crim. 2d 402, *Accomplice Status Undisputed—Corroboration*, which instructed the jury that Tops was an accomplice as a matter of law and that corroboration of his testimony was required:

The witness *Philemon Carnell Tops*, by his own testimony, was what is known as an accomplice. A person cannot be convicted of a felony upon the uncorroborated testimony of an accomplice. You cannot, therefore, convict the defendant of aggravated robbery and battery in the 1st degree upon the testimony of that witness unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offenses. The corroborating evidence is not sufficient if it merely shows that the offenses were committed, and the circumstances thereof.  The testimony of one accomplice is not sufficient to corroborate that of another accomplice.  The sufficiency of the corroborating evidence is a matter for you to determine.

A different instruction, AMI Crim. 2d 403, *Accomplice Status in Dispute—Corroboration*, assigned the jury the duty of determining whether Aalseth and Campbell were accomplices:

A person cannot be convicted of a felony upon the uncorroborated testimony of an accomplice.

SLIP OPINION

An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:

Solicits, advises, encourages or coerces another person to commit it; or

Aids, agrees to aid, or attempts to aid another person in planning or committing it; or

Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

*It is contended that the witnesses <u>Mahogany Aalseth and Brendan Campbell</u> were accomplices. If you find that they were, then <u>James Elijah West</u> cannot be convicted of aggravated robbery and battery in the 1st degree upon testimony of those witnesses, unless that testimony is corroborated by other evidence tending to connect <u>James Elijah West</u> with the commission of the offenses.* Evidence is not sufficient to corroborate the testimony of an accomplice if it merely shows that the offenses were committed and the circumstances of the commission. The testimony of one accomplice is not alone sufficient to corroborate the testimony of another accomplice. The sufficiency of the corroborating evidence is for you to determine.

(Emphasis added.) The final jury instruction relevant to this issue was AMI Crim. 2d 404,

entitled *Mere Presence*:

Mere presence, acquiescence, silence, or knowledge that a crime is being committed, in the absence of a legal duty to act, is not sufficient to make one an accomplice. Therefore, if you find that *James Elijah West* was only present while a crime was being committed and did not have a legal duty to act, then he is not an accomplice.

A person is criminally liable for the conduct of another person if the person is an accomplice of the other person in the commission of an offense. Ark. Code Ann. § 5-2-402(2) (Repl. 2013). Factors relevant to determining whether a person is an accomplice include the presence of the accused near the crime, the accused's opportunity to commit

the crime, and association with a person involved in the crime in a manner suggestive of joint participation. *Wilson v. State*, 2016 Ark. App. 218, at 6, 489 S.W.3d 716, 720.

Mere presence, acquiescence or silence, in the absence of a duty to act, is not enough to create accomplice liability; the knowledge that a crime is being committed or is about to be committed does not create an accomplice. *McGehee v. State*, 348 Ark. 395, 404, 72 S.W.3d 867, 872 (2002). The law is well settled that a witness's status as an accomplice is a mixed question of law and fact; however, when the facts show conclusively that the witness was an accomplice, the issue may be decided as a matter of law. *Id.* The term "accomplice" does not include a person who has guilty knowledge, is morally delinquent, or who was even an admitted participant in a related, but distinct offense. *Id.* To be an accomplice, an individual must either take an affirmative role in the criminal conduct, or owe a duty to the victim that makes it incumbent upon the individual to prevent the commission of the crime. *Id.* When the accomplice status presents issues of fact, the question is submitted to the jury. *Id.*

An instruction should be given when there is any rational basis for giving it. *E.g.*, *Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136, 150 (2003). A trial court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Id.* In reviewing the propriety of giving a jury instruction, the issue is not one of sufficiency; the issue is whether the slightest evidence supports the instruction. *Id.* at 320, 107 S.W.3d at 152. The *Grillot* court noted that it had addressed the scope of accomplice liability in *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002):

> [W]e said that a criminal defendant is an accomplice where the defendant renders the requisite aid or encouragement to the principal with regard to the offense at issue,

irrespective of the fact that the defendant did not directly commit the murder. Furthermore, a defendant may be liable as an accomplice if he assisted and actively participated in the crime. Moreover, when two persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. A participant cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole.

353 Ark. at 320, 107 S.W.3d at 151 (internal citations omitted).

A court should not instruct the jury that a certain witness is an accomplice if there is any dispute in the testimony upon that point. *Odom v. State*, 259 Ark. 429, 432, 533 S.W.2d 514, 516 (1976). Here, the evidence was in dispute as to the roles that Aalseth and Campbell had in the robbery and burglary.

West argues that Aalseth's improbable story about not asking questions demonstrates her encouragement and participation, and that she served as chauffeur and getaway driver for the purchase of marijuana. These, however, were determinations for the jury to make after assessing the weight and credibility of the testimony. *Cf. Blann v. State*, 15 Ark. App. 364, 695 S.W.2d 382 (1985) (affirming conviction for accomplice to second-degree battery where father—the accomplice—drove his son to a location to meet another man for a fight, father participated in the fight, and the son stabbed the other man with a knife; holding that it was unnecessary to determine whether the father knew about the knife). We agree with the State that Aalseth's agreeing to drive West and Tops to Oliver's house with no questions asked does not conclusively demonstrate that she knew about or participated in the robbery or battery.

West also argues that Campbell must have known that the robbery and battery were about to occur because he was the only person who knew where Oliver lived. Again, it was the role of the jury rather than the trial court to make such an inference. No testimony

15

showed beyond dispute that either Aalseth or Campbell knew of West's plan to rob Oliver or that either of them encouraged West to shoot Oliver.

Finally, West argues that the "telephone allegedly found in the abandoned backpack" does not constitute substantial evidence and does not corroborate any testimony without resort to speculation and conjecture. West posits that Oliver could have placed the phone in the backpack; that the backpack belonged to Tops, who had testified about packing clothes earlier in the day; and that Tops may have taken West's phone without West's realizing it. The State points to evidence extracted from the phone—photos of West and his girlfriend and text messages between West and Tops—as proof that the phone belonged to West. We agree with the State that the jury, without resorting to speculation and conjecture, was able to resolve any conflicting testimony and inconsistent evidence regarding the phone.

We hold that the status of Aalseth and Campbell as accomplices was a mixed question of law and fact rather than only a question of law. Thus, instructing the jury that they were accomplices as a matter of law would have been improper.

Affirmed.

ABRAMSON, J., agrees.

HARRISON, J., concurs.

**BRANDON J. HARRISON, Judge, concurring**. I agree with my colleagues' thorough opinion, which fairly recites the material facts and hews to the law. But there is a systemic (and therefore recurring) problem with the jury-instruction law in accomplice-liability cases that should be revisited by the Arkansas Supreme Court, perhaps through its

Committee on Model Jury Instructions–Criminal.  No party in this case raised the problem, but having reviewed this appeal I'm impelled to highlight it because it directly affects the administration of justice in accomplice-liability cases in which witness-corroboration issues arise.

As my colleagues noted, the witness-corroboration rule asks whether other evidence independently establishes the crime, and tends to connect the accused with its commission, if the accomplice testimony was completely eliminated from the case.  *Daniels v. State*, 308 Ark. 53, 821 S.W.2d 778 (1992).  The defendant must prove that a witness is an accomplice whose testimony must be corroborated.  *Lloyd v. State*, 332 Ark. 1, 962 S.W.2d 365 (1998). Under current Arkansas law, however, it appears that a defendant is not entitled to submit a disputed accomplice-status question to a jury on interrogatories.  *See Perry v. State*, 2014 Ark. 535 (Baker & Hart, JJ., concurring).  But how else can a defendant, the prosecution, and the courts know whether an alleged accomplice's testimony had to be corroborated if the defendant cannot submit a "Do you, the jury, find that Person A was an accomplice" question to the jury on interrogatories and receive a "yes" or "no" answer in return?  And how much more speculation is injected into a case when, as happened here, two disputed accomplice-status questions were presented to the jury (witnesses Aalseth and Campbell)? No definitive answer was ever returned by the jury on Aalseth or Campbell.  Consequently, no one knows whether the jury decided that Aalseth was an accomplice, but not Campbell; or perhaps that Campbell was, but not Aalseth.  Maybe the jury found that they both were accomplices.  Maybe neither one was found to be an accomplice.  Given that no one knows what the jury decided because a general instruction was used, a reviewing court cannot

SLIP OPINION

accurately and fairly judge a defendant's sufficiency-of-the-evidence challenge, for example, because it cannot determine whether and to what extent it must apply the witness-corroboration rule to the record on appeal.

In contrast, permitting a defendant to submit a disputed accomplice-status issue to the jury using interrogatories in a manner that alleged accomplices can be separated from one another and the jury can answer "yes" or "no" in return on each one expressly reveals the jury's decision. It is critical to receive a clear and express determination from the jury on a potentially case-altering point. The interrogatory process exchanges speculation for certainty. And it is a neutral practice, meaning no party gains an unfair advantage just because the trial record contains a clear and direct answer from the jury on an accomplice-status issue.

*Hancock Law Firm*, by: *Sharon Kiel*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Priest*, Ass't Att'y Gen., for appellee.