Michael Raymond MacKOOL *v.* STATE of Arkansas

CR 05-609 231 S.W.3d 676

Supreme Court of Arkansas
Opinion delivered March 9, 2006

[Rehearing denied April 13, 2006.]

*Arkansas Public Defender Commission*, by: *Janice Vaughn*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. On September 12, 2003, Janie Ballard was stabbed to death in her home. Subsequently, Ms. Ballard's daughter, Leslie MacKool, and her husband, appellant Mike MacKool, were charged with the crime. Leslie and Mike were tried separately; at both trials, Leslie admitted to killing her

mother, but alleged that she was forced to do so by Mike.[1] At his trial, Mike was convicted of first-degree murder and theft of property. He was sentenced to forty years for the first-degree murder conviction and twenty years for the theft-of-property conviction, with the sentences to be served consecutively.

Mike raises several assignments of error on appeal. Specifically, he argues that the circuit court erred: (1) in denying his motion for a directed verdict; (2) in denying his motion to suppress out-of-court statements; (3) in denying his motion to redact prejudicial and irrelevant portions of his statements; (4) in allowing Leslie MacKool to testify against him over his assertion of the marital privilege; (5) in allowing cumulative, hearsay statements of the victim expressing her fear of the appellant; (6) in granting the State's motion in limine prohibiting him from questioning the State's expert forensic pathologist about the emotional nature of the murder; (7) in allowing jurors to question witnesses; (8) in allowing nineteen irrelevant and highly prejudicial financial documents into evidence; (9) in allowing evidence during sentencing of a thirty-two-year-old investigation and a ten-year-old expunged conviction; and (10) in denying his motion for mistrial based on cumulative error. We affirm.

*Facts*

At 6:00 a.m., on September 13, 2003, Mickey Holloway, a crime scene specialist for the Little Rock Police Department, found Ms. Ballard dead in her home. Ms. Ballard had been stabbed over seventy times, and her throat had been slit in an attempted decapitation. Further, one of Ms. Ballard's vehicles, a coin collection, and jewelry were missing from the home.

Holloway was a friend of Ms. Ballard's, and he checked in with her daily. Because he was unable to reach Ms. Ballard on the telephone, he stopped by her house on the morning of September 13. After finding Ms. Ballard's body, Holloway immediately contacted the Little Rock Police Department, and Officer Steve

---

[1] Both Leslie and Mike were charged with capital murder and theft of property. In a separate trial, Leslie was convicted of both charges. She was sentenced to a term of life imprisonment without the possibility of parole for the capital-murder charge and five years' imprisonment for the theft-of-property charge, with the sentences to run concurrently. This court affirmed Leslie's convictions and sentences. *See MacKool v. State*, 363 Ark. 295, 213 S.W.3d 618 (2005).

Dodge was dispatched to the Ballard home to secure the crime scene and begin an investigation into the murder. Upon Dodge's arrival, Holloway told him to question Leslie and Mike because they were probably responsible for the murder.

Holloway suggested that Dodge question the two because on numerous occasions, Ms. Ballard had told Holloway that she was afraid that Leslie and Mike would kill her for her money. In the days leading up to her death, Ms. Ballard expressed those same fears to others. After her husband and Leslie's father, Lester Ballard, died on August 19, 2003, Ms. Ballard became much more fearful.

Under Mr. Ballard's will, Ms. Ballard was the primary beneficiary, and Leslie was entitled to receive only $25,000 of an estimated $2.4 million estate. Leslie testified that when Mike read the will, he interpreted it to say that if her mother died within thirty days of her father, Leslie would inherit everything. She said that Mike then began telling her that her mother deserved to die.

Leslie further testified that Mike devised a plan for her to kill her mother, and he forced her to cooperate by telling her that if she did not do it, he would kill her and her mother. She said that Mike told her she was to dress all in black and wear a wig and gloves while committing the crime. Leslie testified that on the morning of the murder, Mike woke her and told her that they were going to her mother's house. She said that she did not dress herself; rather, Mike dressed her in a black turtleneck, black ski pants, and a black wig. She said that Mike gave her a backpack that contained a towel, a pair of "wire clipper things," and a butcher knife. Leslie testified that Mike told her that in order to cause her mother's death, she needed to stab her mother in the neck, kidneys, and lungs.

Later that morning, Mike dropped Leslie off at her mother's house, and Leslie waited in the bushes for twenty to thirty minutes until her mother arrived home, at which point Leslie followed her mother into the house and stabbed her over seventy times. Leslie testified that per Mike's instructions, she took her mother's jewelry and her father's coin collection, as well as other items in the house, and drove away in her mother's Cadillac. Leslie said that Mike instructed her to park the car at a place he had shown her in the Fourche Dam area.

Leslie stated that, while the plan was for Mike to be there waiting for her at the designated spot, when she arrived, Mike was not there. Leslie drove around and eventually called Mike from a

pay phone. He later arrived in his truck to pick her up. Leslie said that Mike put the backpack, jewelry, and coins into his truck. The Cadillac, with the keys in it, was abandoned, and the two then returned to their home.

Once back at home, Leslie stripped off her clothes and washed off in the backyard. Subsequently, Mike and Leslie went to Mike's parents' house in Hot Springs. Leslie said that while there, Mike started a fire in a fire pit located on his parents' property and told her he was going to burn her clothes, the backpack, and the knife. She further testified that Mike got mad at her and told her what a bad job she had done. According to Leslie, Mike told her that he probably needed to kill her because she was going to get him into trouble; however, Mike told her that he might let her live because he had things that he could hold over her head. It was then, Leslie said, that Mike told her he had not burned all of her clothes, but had hidden them at their home.

The following day, Leslie and Mike went to a jewelry store in Hot Springs to have the coins appraised. Thereafter, the two returned to their home in Little Rock, where the police soon arrived. Detectives informed each of the MacKools separately of Ms. Ballard's murder. Detective Eric Knowles was among the investigators who went to the MacKool home, and he testified that upon learning of Ms. Ballard's death, Mike reacted with loud sobbing and crying sounds and ran to embrace Leslie. He said that Mike hugged Leslie for a couple of minutes, and that his emotions were cut off as quickly as they were turned on, explaining that when Mike turned to face the investigators, he was dry-faced and had not shed a tear. Investigators requested that Mike and Leslie follow them to the police station for questioning. Leslie said that Mike drove them to the police station, and that during the drive, he told her repeatedly that if she even mentioned his name, he would find out and kill her. She further testified that Mike coached her on how she should behave, telling her to act upset and "be convincing."

Once at the police station, the MacKools were questioned separately; Detectives Alan Quattlebaum and Ronnie Smith questioned Mike. Mike said that he had been around Ms. Ballard only on a couple of occasions, and that while Ms. Ballard was nice to him, he knew she did not approve of him. Mike told police that a week prior to Ms. Ballard's death, Leslie went to her mother's home and returned with her father's coin collection and some pictures. According to Mike, Leslie was upset because her mother

had already disposed of most of her father's things. Quattlebaum asked Mike whether Leslie had received an inheritance from her father, and Mike responded, "Don't ask me. I have no idea what is in the will for her or what's hers or what's not hers or how much she's to get or anything. I don't know." Detective Smith testified that Mike's demeanor was "silly," "goofy," "arrogant," and "manipulative," and he said that Mike did not seem to care about Ms. Ballard's death. For her part, Leslie claimed that she and Mike had a great relationship with her mother and denied any involvement in the murder.

After Mike gave his statement, detectives told him he was free to go. However, police were still questioning Leslie, so Mike chose to remain at the station and wait for Leslie in the hallway. Detective Smith testified that while Mike waited, he appeared to nap on a bench, and at one point, Mike made a paper airplane and flew it in the hallway.

Detectives continued to question Leslie and, eventually, she admitted that she had killed her mother. She also told police that Mike was involved in the murder. Subsequently, detectives arrested Mike and informed him that Leslie had implicated him in the murder, and he was placed in an interview room and given his *Miranda* warnings. Mike refused to waive his rights, so the detectives left. According to Detective John White, about five minutes later, Mike knocked on the door and asked White what Leslie was saying about him. White told Mike that Leslie had named him as a co-conspirator in the homicide. White testified that Mike then told him that he did not "take part in or have anything to do with Ms. Ballard being chopped up." When asked how he knew this detail of the crime, Mike said that he had heard the information in passing from other detectives; however, he was unable to name a particular detective who made the comment. White then told Mike that unless he waived his *Miranda* rights, detectives could no longer speak with him. Mike asked White to sit down and talk with him, and White said that they talked about "personal matters" in Mike's life, but they did not discuss the homicide. After talking to Mike for ten to fifteen minutes, White left.

Shortly thereafter, Mike barricaded himself in the interview room and cut his wrists. Detectives entered the room, using pepper spray to get Mike away from the door. Mike was treated by emergency medical technicians and then driven to UAMS for stitches to his wrist wounds. White testified that before leaving for the hospital, Mike told him he wanted to speak with him, so White

told him that he would be brought back to the station after treatment so that they could talk.

After being treated at UAMS, Mike was transported back to the police station by Officer John Bracey. While riding in the patrol car, Mike conversed with Bracey, and the mobile video recorder (MVR) in the car recorded their conversation. During the ride, Mike initiated topics of conversation and asked questions of Bracey. Mike said he knew that the detectives wanted him to go back to the station because they wanted more statements from him. Bracey said, "They want the truth this time?" and Mike said, "Yep, they want that out [of] me." Bracey asked Mike if he was going to tell the truth this time, and Mike responded, "No," then "I'm going to tell the truth but I want my attorney there." A few minutes later, Mike asked, "Can you kill the music while I ask you something?" Bracey replied, "Yeah, sure. What's up?" Mike said, "I don't really know if you'll tell me the truth or not" "but I'm gonna ask you anyway." Mike then asked Bracey if he should be "up front" with the police, and Bracey told him, yes, that's what he would do, but that he couldn't tell Mike what to do. Mike continued talking about whether to tell the truth, and Bracey asked, "Would you have asked me that question if you was not guilty?" Mike replied, "Probably, no. Ain't got no reason to." Later in the conversation, when the two were talking about what Leslie might be saying to police, Mike said, "She's the one who can cry and trying to say I made her do it, you know that's just a bunch of bull."

After arriving at the station, Mike was *Mirandized* and interviewed by Detectives White and Knowles. Mike told the detectives that Leslie felt betrayed by her mother because of an incident involving a condominium. He also said that he had wanted Ms. Ballard arrested because she had taken $2,000 worth of tools from him. When asked about Leslie's inheritance from her father, Mike said he thought Leslie was getting $25,000, and he said that Leslie told him she was "getting screwed" because her uncle was getting $10,000, and the rest of her father's estate was going to her mother.

According to Mike, Leslie decided to go over to her mother's house dressed all in black because she did not want to be recognized. Mike said that he could not figure out why Leslie would not want to be seen going to her mother's house. He said that he asked her why, but he could not remember what she said in response. Mike said that he dropped Leslie off at her mother's

house, and that at that time, she was wearing a black wig and carrying her backpack. He said that he had no idea whether Ms. Ballard was home when he left.

Mike said that when he dropped Leslie off, she told him to come back and pick her up. Mike said that he went home, got his motorcycle, and rode back by the house to see if Leslie was still there and if she wanted to go for a ride on the motorcycle. At one point during his statement, Mike said that he waited an hour before going back to get Leslie. Later, he said he waited only ten minutes before returning. Mike stated that when he arrived back at Ms. Ballard's house, he did not see Leslie, so he pulled into the park across the street. Mike stated that while he was in the park, he saw two deer. He also said that he saw a postman who was asleep in the park, so he awakened the postman and showed him the deer.

Mike said that about two hours later, Leslie called him "in a panic mode," and told him to come and pick her up. He said that Leslie gave him directions to where she was [the Fourche Dam area], and that when he arrived to pick her up, she jumped out of her mother's Cadillac and ran over to his truck, carrying two bags. Mike said that Leslie told him, "let's get out of there, let's get out of there, [sic] I been driving around for two hours." Mike stated that Leslie then told him she and her mother had gotten into a fight and that she ended up stabbing her. He also said that after stabbing her mother, Leslie took her dad's coin collection and a couple of pictures. Mike said that after hearing Leslie's admission, he did not know what to do. He stated that Leslie said she wanted to keep him "out of it completely — she — because I've got two children, she just says I don't want you in it, she says, I'll take responsibility . . . she goes I did it, it's my responsibility." Mike admitted that after learning what had happened, he hid some things in a tire because he was afraid "that she's gonna frame me and I want to say look, I've got this to show you that she did it, and I didn't do it because of her DNA and that's why I did it."

Mike said that when he and Leslie went to Hot Springs, Leslie burned two duffle bags in the burn pile on his parents' property. He also said that Leslie wanted to take the knife out of the bag and throw it into the lake and, with a map that he had drawn, Mike explained to detectives where the knife had been thrown. Mike further said that while they were in Hot Springs, Leslie again told him, "you didn't do it and it was all my idea and I'm gonna take responsibility and if we get caught because it was my idea, I did it."

Mike maintained that he did not help Leslie kill her mother, and that he planned no part of the crime. He said that he did not drop Leslie off at her mother's house for her to kill her mother. Rather, he said that he took Leslie to her mother's house to get a car. Mike said he did not understand why Leslie wanted him to come back over in an hour on the motorcycle if she was going to be getting a car from her mother. He said that the only explanation he could think of was that Leslie had gotten into an argument with her mother and could no longer get the car.

Mike concluded his statement to White and Knowles by saying, "You know she's down there trying to make me the bad guy, the victim — the — the — planner, whatever, I mean if I want money, all I got to do is go cash my cashier's checks, go sell a couple of cars, go do whatever, sell my house, just move away I mean. . . ."

### Directed-Verdict Motion

For his first point on appeal, Mike argues that the circuit court erred in failing to grant his motion for directed verdict. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002).

A person commits murder in the first degree when he or she purposely causes the death of another person. *See* Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). A person acts "purposely" with respect to his or her conduct or a result thereof when it is his or her conscious object to engage in conduct of that nature or to cause such a result. Ark. Code Ann. § 5-2-202(1) (Repl. 1997).

A person commits theft of property when he or she knowingly takes the property of another person with the purpose of depriving the owner thereof; it is a Class B felony if the value of the property is $2,500 or more. Ark. Code Ann. § 5-36-103(a)(1) and (b)(1)(A) (Supp. 2005). A person acts knowingly with respect to his or her conduct when he or she is aware that his or her conduct is of that nature. Ark. Code Ann. § 5-2-202(2) (Repl. 1997).

A person is criminally liable for the conduct of another person when he or she is an accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402(2) (Repl.

1997). A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he or she solicits, advises, encourages, or coerces the other person to commit it, or if he or she aids, agrees to aid, or attempts to aid the other person in planning or committing it. Ark. Code Ann. § 5-2-403(a)(1), (2) (Repl. 1997).

The State's theory of the case was that Mike was Leslie's accomplice in the murder and theft of property of her mother. The circuit court determined that as a matter of law, Leslie was an accomplice. Arkansas law is clear that a conviction "cannot be had in any case of felony upon the testimony of an accomplice. . . unless corroborated by other evidence tending to connect the defendant. . . with the commission of the offense." Ark. Code Ann. § 16-89-111(e)(1)(A) (Supp. 2003). The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. Ark. Code Ann. § 16-89-111(e)(1)(B) (Supp. 2003). The corroboration must be sufficient, standing alone, to establish the commission of the offense and to connect the defendant with it. *Tate v. State*, 357 Ark. 369, 167 S.W.3d 655 (2004). The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Id.*

Corroboration must be evidence of a substantive nature, since it must be directed toward proving the connection of the accused with the crime, and not directed toward corroborating the accomplice's testimony. *Tate, supra.* Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. *Id.* Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Id.* Rather, it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. *Id.* The presence of an accused in the proximity of a crime, opportunity, and association with a person involved in the crime are relevant facts in determining the connection of an accomplice with the crime. *Id.* When two or more persons assist each other in the commission of a crime, each is an accomplice and criminally liable, ultimately, for his own conduct, but he cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. *Andrews v. State*, 344 Ark. 606, 42 S.W.3d 484 (2001).

Mike challenges the sufficiency of the evidence on the basis that there was insufficient corroboration of accomplice testimony. In support of his argument, he contends that the State made no effort to corroborate many of Leslie's claims about the incident itself, and in many instances, presented evidence that actually disproved the claims. Further, he contends that several of Leslie's claims "simply made no common sense." While it is true that the State made no effort to corroborate some of Leslie's claims, it is not necessary that an accomplice be corroborated on every fact or detail. And, even if we assume, as Mike suggests, that some of Leslie's claims are false because they are illogical, the credibility of witnesses is an issue for the jury and not the court. *Burley v. State*, 348 Ark. 422, 73 S.W.3d 600 (2002). The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *See, e.g., Cobb v. State*, 340 Ark. 240, 12 S.W.3d 195 (2000). Although the jury must be instructed that circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other conclusion, this is not the standard by which we review the evidence. *Echols v. State*, 326 Ark. 917, 938, 936 S.W.2d 509, 518 (1996). Our responsibility is to determine whether the verdict is supported by substantial evidence, which means whether the jury could have reached its conclusion without resorting to speculation or conjecture. *Id.* (citing *Cassel v. State*, 273 Ark. 59, 616 S.W.2d 485 (1981)).

Still, Mike contends that only one witness — Leslie — gave testimony, circumstantial or otherwise, connecting him to the crimes. Mike argues that when Leslie's testimony is excluded, there is insufficient evidence to connect him to the murder.

As previously stated, the test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Tate, supra*. Clearly, the remaining evidence established the commission of the murder. Mickey Holloway testified that he discovered Ms. Ballard's body on the morning of September 13, 2003. Dr. Erickson, the medical examiner who performed the autopsy, stated that there were well over seventy sharp-force injuries to Ms. Ballard's body. He further testified that it was his opinion that Ms. Ballard's death was caused by multiple stab wounds and that the manner of her death was certainly homicide. As to the theft-of-property charge, Holloway testified that when

he went to Ms. Ballard's home on the morning of September 13, the Cadillac was missing from the garage. Furthermore, Mike stated that when he picked up Leslie in the Fourche Dam area, she was in her mother's Cadillac.[2]

The remaining question is whether the evidence connects Mike with the crimes. In addition to Leslie's testimony, the State played for the jury three recorded statements Mike made to the police: Mike's statement as a "person of interest" to Detectives Smith and Quattlebaum and, after he was arrested, Mike's statement to Officer Bracey while in the patrol car and Mike's statement to Detectives White and Knowles at the police station. The contents of Mike's statements reveal inconsistencies concerning the nature of his involvement in the murder of and theft from Ms. Ballard. In his first statement to the police, Mike denied any involvement in the crime, claiming that he had no knowledge of the murder. However, after learning that Leslie had implicated him in the murder, he informed White that he "didn't take part in or have anything to do with Ms. Ballard being chopped up." A short time later, Mike barricaded himself in the interview room and cut his wrists. Subsequently, when riding in the patrol car with Officer Bracey, Mike asked the officer if he should tell the truth about what happened, and Bracey said, "Would you have asked me that question if you was not guilty?" Mike replied, "Probably, no. Ain't got no reason to." Then, in his statement to White and Knowles, Mike placed himself at the scene of the crime, and he admitted that he helped Leslie get rid of evidence.

In addition, Mike made a false statement to the police about the coins. During his interview with Smith and Quattlebaum, Mike said that Leslie received her father's coins about a week prior to Ms. Ballard's death. In his statement to White and Knowles, Mike said that Leslie took her father's coins at the time of the murder.

Mike also gave a false statement regarding his knowledge of Mr. Ballard's will. In his first recorded statement, Mike said that he had no idea what Leslie was to inherit under the will. On the other hand, when speaking to White and Knowles, he provided detec-

---

[2] Although there was evidence that coins and jewelry were taken at the time of the murder, the Cadillac was the only property valued for the purpose of the theft charge. Defense counsel conceded at trial that the State had met its burden of establishing that the Cadillac was worth $2,500 or more.

tives with the details of the will; specifically, he stated that Leslie had told him she was to receive $25,000, her uncle was to receive $10,000, and her mother was to receive the rest.

Mike stated that even though he believed Leslie was exhibiting strange behavior, in that she was wearing all black clothing and a black wig in the middle of the day and stating that she did not want anyone to see her, he left her alone at her mother's house, even though he "had no idea" whether Ms. Ballard was at home. Mike also gave conflicting statements as to why he had taken Leslie over to her mother's house and why he had returned to the Ballard home on his motorcycle. Mike said that he took Leslie to her mother's house to get a car, but he also said that Leslie told him to pick her up in an hour on his motorcycle. At one point he said that he returned in an hour; yet, at another point, he said that he headed back to the Ballard home ten minutes after he had dropped Leslie off.

This court has held that false statements to the police may constitute corroborating evidence. *See McGehee v. State*, 348 Ark. 395, 72 S.W.3d 867 (2002). We have further held that the jury is not required to lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001). The jury may well have considered Mike's false statements to the police to be corroborative of his guilt. Moreover, the jury may well have found many of Mike's explanations of suspicious circumstances to be improbable.

It is well settled that the acts, conduct, and declarations of the accused, before or after the crime, may furnish necessary corroboration. *McGehee, supra*; *Barnett v. State*, 346 Ark. 11, 53 S.W.3d 527 (2001); *Daniels v. State*, 308 Ark. 53, 821 S.W.2d 778 (1992); *Henderson v. State*, 279 Ark. 435, 652 S.W.2d 16 (1983). Mike contends that the evidence presented by the State did nothing but leave the jury to speculation and conjecture as to his involvement in the crimes, and that there are other reasonable explanations for his acts, conduct, and declarations. For example, he argues that his act of cutting his wrists is not indicative of his guilt. Instead, he claims that another entirely logical and reasonable explanation for his self-injury is that he was distraught over his wife's duplicity and betrayal. Detective White testified that after Mike cut his wrists, he was upset and crying. He said that Mike was "screaming, yelling and just . . . more distraught than anything that

he was being arrested and that [Leslie] was telling us. . . . everything that had taken place."

We note that Mike did not contend below, nor does he contend here, that the evidence is inadmissible.[3] Rather, he appears to argue that the evidence cannot be considered as corroborative of his guilt because there is another reasonable explanation, other than his guilt, to explain why he cut his wrists. We believe that once it was admitted, the evidence of Mike's cutting his wrists and the significance to be attached to such evidence are matters exclusively within the province of the jury.

In addition to the corroboration by Mike's own statements and conduct, the State presented testimony from three of Ms. Ballard's friends concerning her fear of Mike. Aside from providing proof of Ms. Ballard's fear, the testimony also provided proof of the State's theory that the crimes were committed for financial gain. Holloway said that Ms. Ballard was afraid that both Leslie and Mike would kill her for her money, but that she was primarily concerned about Mike. Maddox also stated that Ms. Ballard feared Mike and Leslie. She said that Ms. Ballard told her she was "afraid of what they might do" once Leslie received the information about her father's will. Stan Rauls testified that Ms. Ballard had related to him that she was extremely afraid of Mike, but that she had never told him she was afraid of her daughter.

We conclude that Mike's own statements to the police, some of which contained inconsistencies, Mike's conduct before and after the crime, and the statements of Ms. Ballard's friends regarding her fear of Mike tend to connect Mike to the offenses for

---

[3] Many jurisdictions have held that evidence of an accused's attempt to commit suicide is admissible because it is probative of a consciousness of guilt. *See, e.g., People v. Butler,* 12 Cal.App.3d 189, 90 Cal.Rptr. 497 (1970); *People v. Summitt,* 104 P.3d 232 (Colo. Ct.App. 2004); *McKinney v. State,* 466 A.2d 356 (Del. 1983); *Walker v. State,* 483 So.2d 791 (Fla. Dist. Ct.App. 1986); *Aldridge v. State,* 229 Ga.App. 544, 494 S.E.2d 368 (1997); *State v. Hargraves,* 62 Idaho 8, 107 P.2d 854 (1940); *People v. Campbell,* 126 Ill.App. 3d 1028, 467 N.E.2d 1112 (1984); *State v. Mitchell,* 450 N.W.2d 828 (Iowa 1990); *Commonwealth v. Sheriff,* 425 Mass. 186, 680 N.E.2d 75 (1997); *State v. Painter,* 329 Mo. 314, 44 S.W.2d 79 (1931); *State v. Campbell,* 146 Mont. 251, 405 P.2d 978 (1965); *State v. Plunkett,* 62 Nev. 258, 149 P.2d 101 (1944); *State v. Brown,* 128 N.H. 606, 517 A.2d 831 (1986); *State v. Mann,* 132 N.J. 410, 625 A.2d 1102 (1993); *State v. Blancett,* 24 N.M. 433, 174 P. 207 (1918); *State v. Hunt,* 305 N.C. 238, 287 S.E.2d 818 (1982); *Commonwealth v. Giacobbe,* 341 Pa. 187, 19 A.2d 71 (1941); *State v. White,* 649 S.W.2d 598 (Tenn. Crim.App. 1982); *State v. Onorato,* 171 Vt. 577, 762 A.2d 858 (2000). *But see State v. Coudotte,* 7 N.D. 109, 72 N.W. 913 (1897).

which he was charged. We are not persuaded by Mike's argument that there is no evidence that tends to connect him to the theft-of-property charge because the State presented no evidence that he was ever in possession of the vehicle. A participant cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). While there was no evidence that Mike ever drove the Cadillac or that he had the vehicle in his possession, the jury may well have determined that Mike facilitated the theft by leaving Leslie, without a vehicle, at her mother's house. Further, there was evidence that the theft of the Cadillac was part of the plan to murder Ms. Ballard. We are not required to isolate these incidents if they are part of a plan. *See Thrash v. State*, 291 Ark. 575, 726 S.W.2d 283 (1987); *Sumlin v. State*, 273 Ark. 185, 617 S.W.2d 372 (1981).

Finally, we reject Mike's contention that the State presented inconsistent theories in the separate trials of Leslie and Mike. In connection with this argument, Mike claims that the State failed to prove an element of first-degree murder: that he acted purposely. He contends that throughout his trial, Leslie testified that she had nothing to do with the planning of the murder and did not purposefully kill her mother. Therefore, Mike contends, if Leslie did not act purposely, it follows that he, as her accomplice, did not act purposely. Mike acknowledges that Leslie has already been found guilty of capital murder, which required a finding that she committed "premeditated and knowing" murder. He further acknowledges that first-degree murder, which requires that a person act "purposely," is a lesser-included offense of capital murder. However, he contends that the State has changed its theory since Leslie's trial, because in her trial, the State argued that Leslie was lying about enduring spousal abuse and being under severe duress, whereas in Mike's trial, the State argued that Mike did abuse Leslie and did cause her to act under severe duress.

Prior to trial, defense counsel presented his inconsistent-theory argument to the circuit court when arguing that Leslie should not be allowed to testify. In response to this argument, the State contended:

> [T]he question isn't so much what her testimony is going to be. It's what the State argues that it's proof of this defendant's guilt, and is there a consistent theory of the case that — that attaches from that first trial through this trial? And we, adamantly, believe that there

is. In fact, we tried that case mindful of that. We knew that's why defense counsel was sitting there watching the trial, because they wanted to be sure that we did not present what could be inconsistent facts. We will not be arguing that Ms. MacKool, you know, preceded [sic] because she was forced or brainwashed by this defendant. We believe that they are co-equal partners now. Is she going to admit to that? We don't think so, but we're not going to argue that. We think defense counsel will impeach her if we don't, and I figure that we'll probably bring out the inconsistencies so that the jury knows we're not presenting them inconsistent — the facts that we think are — that we don't — make sure that the jury understands what we believe from her testimony and what we don't believe.

The circuit court determined that the State was not presenting an inconsistent theory, stating:

But — but excluding her from testifying because she's a liar and — and because of the fact that the State may be giving inconsistent or might be involved in giving an inconsistent or taking an inconsistent position. I'm going to deny that.

We agree with the circuit court's ruling and find no abuse of discretion.

### Motion to Suppress

Mike argues that the circuit court erred in denying his motion to suppress out-of-court statements he made to the police. At issue are statements Mike made after he invoked his right to remain silent and his right to an attorney. Before trial, Mike moved to suppress the statements he made while in the patrol car, as recorded on the MVR, and statements he made during his interview with Officers White and Knowles, as well as the fruits of those statements. A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* To make this determination, we review the totality of the circumstances surrounding the waiver, including

the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* We will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Id.* Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id.*

Mike first points to the conversation he had with White when he asked White what Leslie had said about him. While acknowledging that he asked White a question, he contends here, as he did below, that after White answered his question, he tried to induce Mike to make an incriminating statement. He states that after White told him what Leslie had said about him, he then told Mike that he knew Mike had been back to Allsopp Park on his motorcycle, and that he knew Mike was lying. Then, Mike argues, before White left the room, in an obvious effort to "bait" him, White added that unless Mike waived his rights, he could not talk to him any further.

The circuit court concluded that Mike reinitiated his contact with police when he asked White what Leslie had said, finding:

> I think that he reinitiated his contact with the — with the State when he asked what was going on. And I think the officer's response was appropriate. And also I need to make this additional — just to make the record clear, now, the officer did not take a statement from the defendant at that time. He — his concern was for him to — I mean, I think the defendant later on then did something and he — he — the defendant again said that he wanted to talk to the officer, but the officer — Officer White said, no, you know, you need to take care of yourself first and then, you know, I'll deal with you later. But I think that he subsequently said, look,

I want to talk to you. I want to talk. I want to talk. And he's like no, no, no, I don't want to talk right now. You need to go to the hospital and take care of yourself and I'll talk to you later.

The framework for analyzing the admissibility of statements made after a defendant invokes his right to counsel was set forth in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), where the United States Supreme Court stated:

[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

 Thus, a statement will be admissible only if the accused initiated further contact, and in doing so knowingly and intelligently waived the right he had invoked. *Esmeyer v. State*, 325 Ark. 491, 930 S.W.3d 302 (1996). The pertinent inquiry is whether the defendant initiated the interrogating process with the police after invoking his right to counsel. *Id.* Here, the circuit court did not err in concluding that Mike initiated the conversation with White. The record reveals that after White exited the interview room, Mike summoned him back by knocking on the door. White testified that when he arrived, Mike said, "Hey, can I talk to you?" "Can you tell me what's going on?" "Can you tell me what she said?" Though Mike had previously invoked his rights, he clearly waived those rights when he initiated further communication with White.

Still, Mike maintains that even if he waived his rights by initiating further communication with White at the police station, he *again invoked* his rights to Officer Bracey while being transported from UAMS to the detention facility. Although there is some dispute as to the exact wording of a few of the statements, the pertinent parts of the transcript of the MVR tape are as follows:

MACKOOL: We got to go back down there? . . . You know why they want me to go? . . . . I know why they want me to go. . . . Because they want more statements from me.

BRACEY: They want the truth this time?

MacKOOL: Yep, they want that out me.

. . .

BRACEY: You ain't gonna tell 'em the truth [t]his time either?

MacKOOL: I'm going to tell the truth, but I want my attorney there.

BRACEY: . . . Okay.

MacKOOL: If my attorney's there, I'll be glad to tell him whatever he wants to know.

BRACEY: Okay.

. . .

MacKOOL: Can you kill the music while I ask you something?

BRACEY: Yeah, sure. What's up?

MacKOOL: I don't really know if you'll tell me the truth or not.

BRACEY: Okay.

MacKOOL: But I'm gonna ask you anyway.

BRACEY: Go ahead.

MacKOOL: Is it good to be up front with them? You're gonna say yes.

BRACEY: Yeah, I mean, I would say yes regardless, I mean. If you didn't do it, say you didn't do it. If you did it, I mean, that's up to you. I'd be up front. But that's just me, okay. I can't tell you how to do your thing.

MacKool: Yeah.

Bracey: But of course, I'm gonna say yeah. Wouldn't you expect somebody to be up front with you with everything? Huh?

MacKool: If I was actually busted, I mean, if I was actually busted, I would actually think first, whatever they told me would be used against me whatever they told me.

Bracey: Well, let me ask you that here. Would you have asked me that question if you was not guilty?

MacKool: Of the charges?

Bracey: Yeah. Would ya?

MacKool: Probably, no. Ain't got no reason to.[4]

Bracey: See, that's what I'm talking about, I mean, if . . . no, I don't know. I wasn't there.

MacKool: You hear all the time, tell them everything, they got you an attorney there.

Bracey: Well, if that's how you feel, I'm gonna suggest you do that. You see what I'm saying. If they've read you your rights and, and told you you have a right to have your attorney there. Then that's the route should you go. If you want to talk to them without your attorney there, then all of this is totally up to you. I mean, cause they read you your rights and you want your attorney there, then I'm gonna suggest that you tell them you want to be with your attorney. If you feel like you don't want your attorney there and you want to go ahead on and get this off your chest, tell 'em what you want to. That's up to you too. I ain't got nothing to do with it. All I'm doing is transporting.

MacKool: Well, I really don't know what to do.

---

[4] Mike contends that he said, "Ain't got no reason to *lie*." (Emphasis added.)

BRACEY: Well, you can think about it, if you want to think about it, tell 'em you want to think about it. Everything is totally up to you. You wanna go in there and lie and say I don't, every time you lie, they subject to charge you for it too, so. That's the only reason why I tell people to be up front because if you start lying, they gonna charge you with lying, so. But the whole thing is totally up to you.

MACKOOL: I'm sure she's been with them all night long at the house and ain't no telling what all she's got against me.

BRACEY: Who you talking about, your ex-wife? Oh, I don't know her, I have no idea about.

MACKOOL: She's probably telling them I kicked her ass, you know what I mean?

BRACEY: Yeah, I understand that.

MACKOOL: She's the one who can cry[5] and trying to say I made her do it, you know and that's just a bunch of bull.

BRACEY: I don't know.

MACKOOL: Well, I don't know how I can make somebody do something like that. Just don't make no sense.

. . . .

■ Again, the circuit court found that Mike reinitiated contact with the police, concluding that "the statement — and the question that was going forth — back and forth between the officer and the defendant were not — although they were custodial, they were not given in violation of *Miranda*." The circuit court did not err. Although Mike makes reference to wanting his attorney present, a few minutes later, he wants Bracey to "kill the music" so he can ask a question. It is clear that Mike wanted Bracey's undivided attention. Neither the transcript nor the MVR tape reveals any coercion or intimidation on Bracey's part.

---

[5] Mike claims that he said, "She's the one who committed the crime."

Viewing the totality of the circumstances, the circuit court did not err in denying Mike's motion to suppress. The State has shown that Mike's statements were voluntary, and Mike has failed to prove that any statements he gave were coerced. Further, while it is clear that Mike invoked his rights, it is equally clear that when he did speak to police, he initiated the further communication.

Finally, Mike contends that the State failed to meet its burden of proving that Mike's second statement with Officers White and Knowles was voluntary because the State did not call Knowles to testify. In short, Mike contends that Knowles was a material witness and, as such, the State was required to either produce Knowles or explain his absence. We have stated that whenever evidence is produced indicating that a confession was induced by threats, coercion, or offers of reward, the State has the burden to produce all material witnesses connected to the controverted confession, or to give an adequate explanation for their absence. *Foreman v. State*, 321 Ark. 167, 901 S.W.2d 802 (1995). In determining whether a witness is "material," this court has stated that there must be some connection between the witness and the alleged acts of coercion or an opportunity to observe the alleged coercion. *Id.* Here, Mike claims that he was coerced by White and Bracey, not by Knowles. Even assuming there was some connection between Knowles and the alleged acts of coercion, or an opportunity for Knowles to observe the alleged coercion, the record reveals that Mike declined to testify at his suppression hearing; therefore, he did not offer testimony that his confession was induced in any way. Where there is no specific evidence to refute, the State's burden to produce all material witnesses does not arise. *Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004); *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002) (overruled on other grounds); *Tanner v. State*, 259 Ark. 243, 532 S.W.2d 168 (1976); *Gammel v. State*, 259 Ark. 96, 531 S.W.2d 474 (1976).

### Motion to Redact Portions of Statements

Mike argues that the circuit court erred in denying his motion to redact prejudicial and irrelevant portions of both the recordings and transcripts of his statements to police. After the circuit court denied Mike's motion to suppress, he filed a motion to redact those portions of his statements which referred to "his record" and his right to remain silent. The reference to Mike's record is contained in a statement he made prior to his arrest while

being questioned by Detectives Quattlebaum and Smith. The relevant portion of the transcribed statement is as follows:

> QUATTLEBAUM: . . . you said that for the most part you and Leslie's family — when her dad was alive anyway uh — her mother and dad had gotten along pretty good uh — her mother didn't necessarily approve of the marriage because of an age difference, is that —

> MACKOOL: I don't know if it was the age difference. I just — I don't know why. She never told me. I'm just guessing. I'm guessing it's my record and I'm not good enough for her daughter is what I'm guessing.

The State argued that the comment about his record was ambiguous and could mean something other than Mike's criminal record, such as his "record with the opposite sex." The circuit court agreed, refusing to allow Mike to redact the reference to his record. The decision to admit or exclude evidence is within the sound discretion of the trial court, and we will not reverse a trial court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005). We cannot say that the circuit court abused its discretion in refusing to redact the reference to Mike's record.

With regard to his invocation of rights, the first statement Mike sought to redact was made at the end of his interview with Quattlebaum and Smith. Following is the relevant colloquy:

> SMITH: When did you go to K-Mart?

> MACKOOL: I went to Wal-Mart.

> SMITH: Wal-Mart — when did you go there?

> MACKOOL: This morning. We're going back through there. I'm done — I'm not talking anymore, I'm done, this is enough.

> SMITH: Okay.

> MACKOOL: Well, we're repeating and Chris Palmer's probably gonna be pissed off at me for even giving this statement.

■ Mike requested that "I'm done — I'm not talking anymore, I'm done, this is enough," and his statement regarding attorney Chris Palmer be redacted. The circuit court agreed to redact Mike's statement regarding the attorney; however, it refused to redact Mike's statement that he was "done" and "not talking anymore." The circuit court concluded that the statement was relevant to the issue of voluntariness, in that once Mike said he was finished talking, the State stopped the interview. Though he did not make this argument below, Mike points out in his brief on appeal that there was no longer an issue of voluntariness because the circuit court had already denied his motion to suppress. A circuit court's ruling on relevancy is entitled to great weight and will not be reversed absent an abuse of discretion. *Morris v. State*, 358 Ark. 455, 193 S.W.3d 243 (2004). Though we agree with Mike that the statement was not relevant to the issue of voluntariness, we will not reverse absent a showing of prejudice. *Thomas v. State*, 349 Ark. 447, 79 S.W.3d 347 (2002). Here, we fail to see how Mike was prejudiced by the statement at issue. When read or heard in context with the rest of the interview, we do not believe Mike's statement creates a negative inference that requires reversal.

■ Mike also sought redaction of a comment made by Officer White during Mike's interview with White and Knowles at the police station. During that interview, the following colloquy took place:

> WHITE: But, my — through all — through everything, everything you've gone through, we've sit here and listened to you say how much you love your wife, that's the reason you did it. You take her over to her mother's and drop her off, come back on your motorcycle to pick her up and she's not there. Go back home —
>
> MACKOOL: She said she was gonna be outside waiting.
>
> WHITE: You go back home, she calls you — and you go out and pick her up. She's dressed in black, she tells you that she's just killed her mother.
>
> MACKOOL: And I freak out.
>
> WHITE: And you freak out.

MacKool: And I freak out.

White: And after all this goes on, you were brought down — let me finish — you were brought down here to the Detective Division and we sit up in there and you asked us what she told us and we tell you and you still sat up there and refused to talk to us, am I correct?

Mike sought to redact the portion of White's statement where he makes reference to Mike's refusal to talk. The circuit court denied Mike's request. The State contends that White's statement was not a comment on Mike's silence, but part of a recap of Mike's contact with officers. We agree. We find no prejudice, and absent a showing of prejudice, we will not reverse. *Thomas, supra.*

Mike also argues that White again commented on his failure to waive *Miranda* rights while answering jury questions. During the trial, the following question was submitted by a juror and asked by the circuit court: "When he was transported to the hospital, was he read his rights before transportation?" White responded: "Can I ask you something, Judge?" The circuit court agreed to answer a question, and White said: "I don't know if I can talk about that. I don't know the ruling that the Court made on the first *Miranda.*" Mike immediately objected and moved for a mistrial, arguing that White's statement created a negative inference that Mike had failed to waive his *Miranda* rights. The circuit court denied the motion, finding that nothing White said was prejudicial. While he did not make this argument to the circuit court, on appeal, Mike argues that pursuant to Ark. R. Evid. 512,[6] the circuit court erred in refusing to grant his request for a mistrial when White "commented on [Mike's] invocation of his Fifth Amendment privilege during trial." This court will not consider arguments made for the

---

[6] Rule 512 provides in relevant part:

(a) *Comment or Inference Not Permitted.* The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

(b) *Claiming Privilege Without Knowledge of Jury.* In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

first time on appeal. *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001). Consequently, we will not address the argument concerning Ark. R. Evid. 512.

### Marital Privilege

Mike argues that the circuit court erred in allowing Leslie to testify against him over his assertion of the marital privilege. A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person. Ark. R. Evid. 504(a). An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse. Ark. R. Evid. 504(b). A person upon whom these rules confer a privilege against disclosure waives the privilege if he . . . voluntarily discloses or consents to disclosure of any significant part of the privileged matter. . . . Ark. R. Evid. 510. *See also Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003). Thus, if the same information protected by privilege is disclosed to a third person, the privilege is waived. *See, e.g., Dansby v. State*, 338 Ark. 697, 1 S.W.3d 403 (1999); *Halfacre v. State*, 292 Ark. 331, 731 S.W.2d 179 (1987).

At a hearing on September 16, 2004, Mike requested that Leslie not be allowed to testify with regard to "any communications between her and her spouse regarding this incident." The circuit court ruled that it would allow testimony concerning events taking place from August 2003 up until the murder on September 12. We first wish to emphasize that the privilege applies to *communications*, not to what the spouse heard, saw, and observed in relation to a criminal charge. *See, e.g., Findley v. State*, 307 Ark. 53, 818 S.W.2d 242 (1991); *Sumlin, supra* (emphasis added). Therefore, the State correctly points out that Mike could not prevent Leslie from testifying about what she observed in relation to the criminal charges.

The State also contends that Leslie was properly allowed to testify as to communications that were intended to be disclosed to others rather than to be held confidential, such as the "alibi story" that the MacKools concocted to tell the police. Indeed, this court has held that a fabricated story between spouses intended to be told to the police is not privileged. *See David v. State*, 286 Ark. 205, 691 S.W.2d 133 (1985). Mike argues in his reply brief that there is absolutely no evidence to indicate that he

and Leslie concocted an alibi story to tell anyone and, further, the fact that their statements were so divergent would indicate just the opposite. While we are not convinced that there is evidence of the fabrication of an *alibi,* we do believe that there is evidence of the fabrication of a story to tell the police. Leslie testified that when she and Mike drove to the police station for questioning after being informed of her mother's death, Mike told her repeatedly that if she even mentioned his name while speaking to the police, he would find out and would kill her. She further stated that Mike told her that while she answered questions, she was to act upset and to be convincing. In *David,* the trial court allowed appellant's wife to testify that after he shot the victim, he told her to tell police that the victim had attacked her and that appellant killed the victim in an effort to rescue her. This court held that the spousal privilege did not apply because appellant intended the fabricated story to be told to the police. Appellant then argued that even though he intended for the fabricated story to be told to the police, he did not intend for his wife to disclose the fact that he told her to fabricate it. We disagreed and explained:

> The fact that the appellant told his spouse to tell the story must be allowed into evidence, or else, as a practical matter, the spousal communication remains privileged, even though it is intended for communication. To illustrate, the distinction in this case is the difference between "I told the police . . ." and "He told me to tell the police . . ." The statement "I told the police . . .," standing alone, is not a spousal communication, and is not subject to the privilege under any condition. The statement "He told me to tell . . ." is the predicate or the foundation by which the witness establishes that the remainder of the statement is exempt from the privilege since it establishes the intention to disclose to third persons.

*David,* 286 Ark. at 210, 691 S.W.2d at 138. Pursuant to our holding in *David,* Mike's communication to Leslie about how she should act and what she should not disclose to the police is exempt from the privilege.

▪ The State argues that the balance of Leslie's testimony is exempt from the privilege because Mike disclosed a significant part of the privileged information to a third party. In support of its argument, the State points to the contents of Mike's statements, specifically: (1) Mike's initial statement to the police late on

September 13, 2003, as a person of interest, in which he denied any knowledge of the murder and claimed to have a cordial relationship with the victim; (2) Mike's statement that Leslie got the coin collection from her mother a week before her mother's death; (3) Mike's questions to Bracey concerning whether the police wanted to hear the truth and whether it was good to be up front; (4) Mike's telling Bracey "probably, no," and "ain't got no reason to," when Bracey asked him if he would have asked whether he should tell the truth if he was not guilty; and (5) Mike's statement that Leslie "can cry and trying to say I made her do it, you know and that's just a bunch of bull." The State's argument is well taken. We agree that in making the aforementioned statements to the police, Mike waived his privilege because he disclosed a significant part of the privileged matter.

Before leaving this point, we turn to Mike's remaining arguments, in which he contends that his case is distinguishable from those cases where a spouse testifies due to a waiver of privilege. Mike first argues that in the cases in which a defendant's spouse was allowed to testify at trial due to a waiver of the spousal privilege, the privileged comments had been communicated to a third person other than a police officer. Moreover, Mike argues, the statements in those cases corroborated the spouse's testimony. Mike contends that in this case, even if his comments to the police amounted to statements to third parties, the comments did not corroborate, but rather contradicted Leslie's testimony. Mike cites no authority for the proposition that in order to waive the privilege by disclosing a significant part of the privileged matter, the disclosure must be made to third parties *other than* police. Nor does he cite any authority for the proposition that any disclosure regarding the privileged information must corroborate the spouse's testimony at trial. This court does not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *Kelly v. State*, 350 Ark. 238, 85 S.W.3d 893 (2002).

### Hearsay Testimony

Mike argues that the circuit court erred in allowing the State's witnesses to repeat out-of-court statements made by Ms. Ballard, in which she expressed her fear of Mike. At trial, Mickey Holloway testified that Ms. Ballard told him she was afraid of both Mike and Leslie, but she was primarily concerned about Mike and

afraid he was going to murder her for her money. Lisa Maddox testified that after Mr. Ballard's death, Ms. Ballard told her that she was concerned for her safety and afraid that Mike and Leslie would try to hurt her or kill her for her money. Stan Rauls, the attorney who handled Mr. Ballard's estate, testified that Ms. Ballard was extremely afraid of Mike. Further, he agreed that it was fair to say Ms. Ballard was afraid Mike would kill her.

Mike argues that the testimony was inadmissible hearsay. We disagree. Under Rule 803(3) of the Arkansas Rules of Evidence, the following type of evidence is not excluded by the hearsay rule:

> *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. . . .

We have noted that an expression of fear falls within the hearsay exception of Rule 803(3). *See, e.g, Hodge v. State*, 332 Ark. 377, 965 S.W.2d 766 (1998) (holding that statements that victims had told witnesses they were afraid of Hodge, one made three weeks before death and one made two months before death, were not too remote in time, were admissible under Ark. R. Evid. 803(3), and were relevant); *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993) (stating that witness' testimony that he found the victim crying and when he asked what was the matter, she said, "He's going to kill me" was admissible as a present-sense impression showing the victim's fear under Ark. R. Evid. 803(3)).

Mike argues that even if the statements fell within the state-of-mind exception to the hearsay rule, the victim's state of mind was not relevant to any issue at trial. Further, he argues that even if the statements were relevant, they were clearly more prejudicial than probative and should be excluded. The State argues that in addition to being admissible to show Ms. Ballard's fear under Rule 803(3), the statements are also relevant, and their probative value outweighed any prejudice, because (1) they showed the victim's fear of Mike, (2) the fact that the victim made these statements to many people is a possible explanation for Mike having Leslie physically commit the murder instead of doing it himself, and (3) the statements impeach Mike's original statement to police that he and Ms. Ballard had a good relationship. What is

relevant evidence and what is prejudicial lies within the discretion of the circuit court. *See, e.g, Evans v. State*, 317 Ark. 532, 878 S.W.2d 750 (1994). We cannot say the circuit court abused its discretion in admitting this testimony.

Mike goes on to argue that the cumulative effect of these statements was prejudicial. We disagree. Evidence that is merely cumulative is not prejudicial. *See, e.g., Smith v. State*, 354 Ark. 226, 118 S.W.3d 542 (2003).

### Questions Concerning Emotional Nature of the Murder

Mike next argues that the circuit court erred in granting the State's motion in limine to prohibit him from questioning the State's witness, medical examiner Dr. Steven Erickson, about the emotional nature of the murder.[7] Prior to Dr. Steven Erickson's testimony, the State made an oral motion in limine to prohibit him from answering questions regarding whether the murder was a classic case of "overkill" or whether it was an "emotional killing." The State argued that Dr. Erickson, while qualified to testify as to the cause and manner of death, had never met Leslie, so it was improper for him to testify about her state of mind at the time of the murder. The circuit court ruled that it would allow the defense to elicit testimony about overkill, but that it would not allow Dr. Erickson to testify about the emotional state of the killer.

Thereafter, during direct examination by the State, the prosecutor asked Dr. Erickson if this was a classic case of overkill, and Dr. Erickson answered in the affirmative. During cross-examination, Dr. Erickson testified about a wound to Ms. Ballard's neck, commenting that the wound was the coup de grâce. Dr. Erickson further testified that the wound might be inflicted to make sure someone was dead, or that it might be inflicted for other reasons, such as "emotional things." The State did not object.

Mike then proffered Dr. Erickson's testimony. Dr. Erickson explained that when he said that the murder was "overkill," he meant that the injuries were the result of an extreme emotional

---

[7] Specifically, Mike argues that the circuit court's ruling disallowing evidence from Dr. Erickson not only violated his Sixth Amendment right to confrontation by eviscerating his right to meaningfully cross-examine a State witness, but also violated his Fifth and Sixth Amendment rights to present a defense. Mike did not make these arguments below; therefore, this court will not consider them on appeal. We have long held that we will not address arguments raised for the first time on appeal. *See, e.g., Webb v. State*, 365 Ark. 22, 223 S.W.3d 796 (2006).

state by the perpetrator. He also stated that he hesitated to testify about the psychology of the crime because he was not a psychologist or a forensic psychologist. Dr. Erickson testified that he had performed or been involved in over 3,000 autopsies, had studied numerous forensic psychiatric articles, and through his experience, had learned to ascertain certain knowledge as to how murders occur. Dr. Erickson said that cases such as the instant case, while rare, are well-characterized in the medical literature, and that the distribution, pattern, and severity of these types of injuries are often characterized as being associated with strong, emotional aspects of the case. He said that in general, the case was consistent with a "high emotional content present." Finally, Dr. Erickson stated that while the case was ripe for psychological evaluation, he was "not going to do that." Mike argues that the circuit court erred by not allowing him to question Dr. Erickson about the emotional nature of the crime. He contends that Dr. Erickson's testimony was crucial to his defense, in that it contradicted Leslie's testimony that she killed her mother because Mike forced her to do so. He further contends that the testimony of Dr. Erickson would impeach Leslie's credibility.

The State contends that based on Dr. Erickson's own reservation about his qualifications to render such an opinion, the circuit court properly excluded the testimony. We agree. The standard of review for a circuit court's ruling on the admissibility of expert testimony is abuse of discretion. *Hinson v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000). The circuit court did not allow further questioning because it determined that Dr. Erickson was not qualified to testify about the psychology of the crime. We find no abuse of discretion. Further, as previously noted, when testifying before the jury, Dr. Erickson did express his opinion that the attempted decapitation was "overkill" and that the killer could have inflicted the wound to Ms. Ballard's neck due to "emotional things." Thus, the testimony that Mike sought — that Leslie might have killed her mother for emotional reasons — was before the jury.

### Questions Imposed by Jurors

Mike argues that the circuit court erred in allowing jurors to question witnesses. At trial, the court allowed jurors to question every witness by submitting written questions to the judge. After allowing counsel to object at the bench, the circuit court decided which questions would be asked of each witness. Counsel were

then given a chance to ask follow-up questions pertaining to the subject matter of the jurors' questions.

At a pretrial hearing and again throughout the trial, Mike objected to the circuit court's policy of allowing jurors to question witnesses; however, the circuit court repeatedly overruled his objections. During the trial, jurors submitted fifty-nine questions to be asked of witnesses; six of those questions were disallowed by the circuit court, and the remaining questions were asked of the witnesses. Mike lists several questions that he contends were particularly prejudicial. While he does not specifically explain how he was prejudiced by each question, he argues that generally, his right to a fair trial was compromised by the circuit court's encouragement of jurors to become participants in the trial, rather than to serve as neutral fact-finders. He further argues that the circuit court's actions amounted to an implied invitation for the jury to prematurely deliberate and violated his right to due process by diminishing the State's burden of proof and shifting part of that burden to the jurors and him. Finally, he argues that the circuit court's actions violated his right to present a defense and to take the stand at trial by placing him in the untenable position of not being able to testify, for fear that jurors would ask him improper questions.

This court has previously determined that it is within a trial court's discretion to allow jurors to ask questions of witnesses. In *Ratton v. Busby*, 230 Ark. 667, 682-83, 326 S.W.2d 889, 898 (1959), this court cited with approval from 58 Am. Jur. 311:

> The fact that the trial judge gave the jury permission to interrogate a witness without any special request from them for the privilege has been held not to constitute error so long as the questions asked are germane to the issue. Conceding the propriety of permitting a juror to examine a witness, the examination may be carried out in such a manner or under such circumstances as to warrant the trial court in declaring a mistrial or granting a new trial, or if it fails or refuses to do so, to warrant a reversal by the reviewing court; this largely depends upon the facts of the individual case. But it may be said that, generally speaking, the courts have been reluctant to require a reversal or new trial because of the manner in which a juror examined a witness. It has been held not to be error to permit questions by the juror concerning matters that might properly have been elicited on the direct examination of the witnesses, if they are such as tend to clarify material points in the testimony.

Later, in *Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496 (1974), we rejected the appellant's argument that the trial court erred in permitting jurors to ask questions of the witnesses in a first-degree murder case. We noted that the jurors asked questions "about a half dozen times, and the judge was very careful to tell each witness not to answer until he had held the question to be proper." *Id.* at 4, 513 S.W.2d at 498. *See also Superior Federal Bank v. Mackey*, 84 Ark. App. 1, 129 S.W.3d 324 (2003) (affirming trial court's practice of inviting jurors to question witnesses and noting our approval of the practice in *Ratton, supra*, and *Nelson, supra*). More recently, this court held that the trial court did not abuse its discretion in denying defendant's motion to allow jurors to question him after the State completed its cross-examination. *See Sheridan v. State*, 313 Ark. 23, 852 S.W.2d 772 (1993). Mike acknowledges our prior decisions on this issue, but he contends that in those cases, we did not address the specific arguments that he raises in this case. He urges this court to join the jurisdictions that forbid the practice of jurors submitting questions to witnesses. *See, e.g, Matchett v. State*, 257 Ga. 785, 364 S.E.2d 565 (1988) (stating that direct questioning of witnesses by jurors is not permitted); *State v. Costello*, 646 N.W.2d 204 (Minn. 2004) (holding that no court shall permit juror questioning during criminal trials); *Wharton v. State*, 734 So.2d 985 (Miss. 1998) (condemning and outright forbidding the practice of juror interrogation of witnesses); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377 (1991) (prohibiting juror questioning of witnesses); *Morrison v. State*, 845 S.W.2d 882 (Tex. Crim. App. 1992) (holding that jurors are not permitted to question witnesses in criminal cases).

Although Mike claims he was prejudiced by this practice, he does not point to a specific question that caused him to suffer prejudice; rather, he simply alleges that "many of these previously unasked questions went to the very heart of [his] defense and helped make up some of the State's deficiencies, thus removing some of the jury's reasonable doubt." It is axiomatic that this court will not presume prejudice where the appellant offers no proof of it, *see, e.g., Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005), and some prejudice must be. shown in order to find grounds to reverse a conviction. *See Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004). In light of our precedent in *Ratton, supra*, and *Nelson, supra*, and because Mike has failed to demonstrate

prejudice, we cannot say that it was error for the circuit court to allow the jurors to submit questions to the witnesses in this case.

While we find no prejudice in this case, under the facts and arguments presented, we do wish to express that we have concerns about the practice of permitting jurors to question witnesses. We refer to the Supreme Court Committee on Criminal Practice and the Supreme Court Committee on Civil Practice for consideration the question of whether and under what circumstances we should allow juror questioning of witnesses.

### Admission of Financial Documents

Nineteen financial documents found spread out on the kitchen table in Mike and Leslie's home were admitted as evidence. The documents included a quitclaim deed giving their home to Mike's parents, collection letters, account statements, a default judgment against one of Mike's corporations, and an order voiding a lien to one debtor that was filed in Mike's Chapter 7 proceeding. All were dated in the months prior to Ms. Ballard's death. Mike contends that the circuit court abused its discretion in admitting the documents because they had no probative value and were highly prejudicial. He states that the effect of the documents was to give the jury an image of a "dead beat," unemployed defendant who had led an opulent lifestyle and then filed for bankruptcy. The State contends that the documents were admissible as evidence of Mike's lifestyle to show that the MacKools were having financial trouble and that financial gain was a motive for the murder. We agree. This court has stated that where the purpose of evidence is to disclose a motive for a killing, anything that might have influenced the commission of the act may be shown. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). Evidence of circumstances that explain the act, show a motive, or illustrate the accused's state of mind, may be independently relevant and admissible. *Id.* We conclude that the circuit court did not abuse its discretion in admitting the financial documents.

### Admission of Expunged Conviction and Testimony Concerning Prior Arrest During Sentencing

Mike argues that the circuit court committed reversible error during the penalty phase of the trial in allowing evidence of a thirty-two-year-old investigation and a ten-year-old expunged

conviction. Bobby Thomas testified about the 1972 investigation into the death of fourteen-year-old Jeff Ward. Thomas was employed with the Little Rock Police Department as a homicide detective at that time, and as part of the investigation, he interviewed Mike MacKool, who at that time was seventeen years old. Thomas testified that after he advised Mike of his rights, he agreed to give a statement about the events surrounding Ward's death. Thomas then read Mike's statement aloud. In his statement, Mike said:

> I and Catfish Gray were messing around Friday, the 7th and went out to the Minute Man. We got out there standing around talking. When we started to leave, these three boys asked for a ride towards the Razorback Drive-In. I said okay. We got in the car and left. We stopped at the gas station and got 90 cents worth of gas. We then proceeded on and while driving down Cantrell, he threw up all in the backseat of my father's car. I asked — I asked him if he threw up and the other boy said no. It was the water and ice in the ice chest. Catfish then said you threw up, didn't you? He said no. I turned around and he had stuff all over his mouth. Then I rolled his back window down to get him some fresh air. When we got to Kavanaugh and Cantrell, we pulled in a service station. He got out and I then saw that the stuff [sic] he had lied about it. I just got out and walked around and hit him. He fell down. I tried to pick him up. He wouldn't get up. His eyes were closed. So I kicked him in the right shoulder to wake him up, but he still laid there. The other boys got out to take him home, I guess, and we left to go home.

After reading Mike's 1972 statement, Thomas testified that he had confirmed through the medical examiner that Ward died as a result of the incident.

The State then called Everett Davis to testify. Davis stated that in 1994, while employed as a patrolman by the Little Rock Police Department, he responded to a reported domestic dispute at Mike MacKool's home. Davis said that while he was there, Mike was on the phone, talking to someone police later determined to be Mike's girlfriend, Tina Puddephatt. Davis testified that while Mike was on the phone with Ms. Puddephatt, he overheard Mike threaten to kill Ms. Puddephatt and their daughter. Davis testified that he requested that Mike come out of the house to talk to him. According to Davis, Mike refused to come out of the house, told Davis he could not come in, and informed Davis that he had a safe

full of guns that he would use if necessary. Davis stated that Mike eventually surrendered himself, some five hours later, and was taken into custody.

■ Mike argues that this evidence was clearly inadmissible pursuant to Ark. R. Evid. 404(b), 608, and 609. The State contends that the evidence of Mike's prior violent acts provided proof of his character and was relevant character evidence. The admissibility of proof in the penalty phase of a jury trial is governed by Ark. Code Ann. § 16-97-103 (Supp. 2003), and it provides a list of new evidence that may be admitted in the sentencing phase, although such evidence might not have been admitted during the guilt phase of the trial. *Crawford v. State*, 362 Ark. 301, 208 S.W.3d 146 (2005); *Buckley v. State*, 349 Ark. 53, 76 S.W.3d 825 (2002). Section 16-97-103(5) generally permits the admission of relevant character evidence at sentencing; whereas, Ark. R. Evid. 404 provides that character evidence is not admissible, except as otherwise permitted under the rule. *Crawford, supra*. Thus, character evidence that might not be admissible at the guilt phase could, under Ark. Code Ann. § 16-97-103(5), be admissible at sentencing. Likewise, Rule 608, which pertains to evidence of character and conduct of a witness, does not override the applicability of § 16-97-103. Further, as the State points out, the evidence offered during the penalty phase was not offered to attack Mike's credibility, so Ark. R. Evid. 609 does not apply.

■ Finally, Mike argues that the circuit court erred in admitting evidence of the thirty-two-year-old investigation and the ten-year old expunged conviction because, pursuant to Ark. Code Ann. § 16-97-103(3)(iii) (Supp. 2003), acts occurring more than ten years prior to the offense charged are inadmissible. Mike is mistaken. Section 16-97-103(3)(iii) provides that in no event shall *delinquency adjudications* for acts occurring more than ten years prior to the commission of the offense charged be considered. Here, the prior acts do not involve delinquency adjudications; therefore, § 16-97-103(3)(iii) is inapplicable. A circuit court's decision to admit evidence in the penalty phase of a trial is reviewed for an abuse of discretion. *Buckley, supra*. We find no abuse of discretion.

### Cumulative Error

Mike argues that the circuit court erred in denying his motion for mistrial based on cumulative error. In addition to the

errors set forth above, Mike argues that (1) the circuit court erred in denying his motion for change of venue, (2) the circuit court erred in denying his motion for mistrial when a potential juror stated in front of the entire jury panel that she had a negative perception of Mike, and (3) the circuit court erred in denying his motion for mistrial after Mickey Holloway told the jury that it was his opinion that Mike was involved in the murder.

We do not address Mike's assertion that the circuit court erred in denying his motion for change of venue because Mike fails to provide any argument on this issue. This court does not research or develop arguments for appellants. *See, e.g., Hathcock v. State*, 357 Ark. 563, 182 S.W.3d 152 (2004).

We now turn to Mike's argument concerning the comment made by a potential juror within the hearing of the jury panel. During voir dire of the prospective jurors, Pam Fuller stated, "My husband and I work out. . . at the Little Rock Athletic Club where Mr. MacKool used to work out and I was acquainted with him there . . . I do have a negative perception of him." After hearing Ms. Fuller's comment, Mike moved for a mistrial, and the circuit court denied his motion.

A mistrial is a drastic remedy and should only be declared when there is an error so prejudicial that justice cannot be served by continuing the trial, or when fundamental fairness of the trial itself has been manifestly affected. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). The trial court has wide discretion in granting or denying a motion for mistrial and absent an abuse of that discretion, the decision will not be disturbed on appeal. *Id.* The course and conduct of voir dire is within the circuit judge's sound discretion, and the latitude of that discretion is wide. *Dillard v. State*, 363 Ark. 491, 215 S.W.3d 662 (2005). Here, shortly after Fuller made her comment, the circuit court made curative remarks to the entire panel and began conducting individual voir dire, at the bench, of jurors who had existing opinions about the appellant or the case. None of those jurors referred to Fuller's statement, and the remaining jurors indicated that they had no opinions that would affect their decision. The circuit court did not abuse its discretion in denying Mike's motion for mistrial.

Finally, Mike argues that the circuit court erred in failing to declare a mistrial when Mickey Holloway testified that he told police he thought Mike was involved in the murder. The State argues that there was no abuse of discretion because the

circuit court admitted the evidence only to show whether the witness made prior inconsistent statements and admonished the jury to consider the evidence only for that purpose and not as evidence of guilt or innocence. Still, Mike argues that an error of this type cannot be cured by an admonishment. We disagree. We defer to the circuit court, as it is in a superior position to determine the effect of the allegedly prejudicial remark on the jury. *Ferguson, supra.* In addition, the record shows that defense counsel had elicited nearly identical testimony from the same witness on cross-examination. We conclude that the circuit court did not abuse its discretion.

In sum, we have considered all assertions of error and concluded that no reversible error occurred in Mike's trial. This court does not recognize the cumulative-error doctrine when there is no error to accumulate. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000); *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995).

Affirmed.