2012 Ark. App. 82

**Bob Dale DEVOR, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–856.**

Court of Appeals of Arkansas.

Jan. 25, 2012.

Walter Pointer Mayo and M. Grant Ragland, Fayetteville, AR, for appellant.

Dustin McDaniel, Atty. Gen., William Andrew Gruber, Little Rock, AR, for appellee.

JOHN B. ROBBINS, Judge.

Appellant Bob Devor was convicted by a jury in Washington County Circuit Court of hindering apprehension or prosecution, and he was sentenced to ten years in prison and a $15,000 fine. He appeals, challenging the sufficiency of the evidence to convict him of this crime. He specifically asserts that the State failed to corroborate the testimony of accomplices and failed to prove the elements required to

sustain a verdict of guilt. After reviewing the evidence under the proper standards of review, we affirm.

When an appellant challenges the sufficiency of the evidence to support a conviction on appeal, the appellate court's test is whether there is substantial evidence to support the verdict. *Britt v. State*, 83 Ark.App. 117, 118 S.W.3d 140 (2003). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or another. *Id.* In determining whether the evidence is substantial, evidence is viewed in the light most favorable to the State, considering only the evidence that supports the verdict. *Id.*

The appellate court does not make credibility determinations; that is a function left solely to the fact-finder. *Meadows v. State*, 360 Ark. 5, 199 S.W.3d 634 (2004). The jury may resolve issues of conflicting evidence and testimony; it may choose to believe the State's account of the facts rather than the defendant's. *Id.* Intent is rarely capable of direct proof but must usually be inferred from the circumstances. *Watson v. State*, 358 Ark. 212, 188 S.W.3d 921 (2004). Jurors are permitted to draw upon their common knowledge and experience to infer intent from the circumstances. *Id.* The jury may infer guilt from improbable explanations of suspicious circumstances or incriminating conduct. *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006).

We now consider the appeal under these legal parameters. Monica Bautista and Delores "Dee" Eggert were accomplices in the June 14, 2007 murder of Dee's mother Polly Devor, who was seventy years old when she disappeared. Monica and Dee killed Polly on the Devor rural ranch property near Siloam Springs; they burned Polly's body in an excavated dumping area on the acreage. In April 2009, Monica became a State witness in exchange for immunity. Dee was arrested for capital murder not long afterward and remained jailed for more than a year. In August 2010, Dee pleaded guilty to first-degree murder of her mother. Bob, Polly's husband and Dee's stepfather, was charged with hindering Dee's apprehension or prosecution. The State contended, in sum, that Bob provided money and a vehicle for Dee to leave the state days after Polly's disappearance, that Bob staged part of the crime scene, and that Bob lied to and misled law enforcement throughout the investigation with the purpose to deter and detract from investigating Dee.

A trial was conducted over three days in January 2011. The following is a summary of the evidence, viewed in the light most favorable to the State. The State presented testimony from the 911 operator who took Bob's phone call at about 9:15 p.m. on Friday, June 15, 2007. The 911 recording was admitted into evidence. Bob calmly reported a burglary, reported that guns and banking items related to their rental properties were missing, and then laughed when he said that he could not find his wife.

Corporal Waggoner from the Washington County Sheriff's Office responded by going out to the Devor property. The Devor property is in northern Washington County, near Siloam Springs, and it consisted of hundreds of acres of pasture land with a ranch house in the middle.

Bob reported that he had been gone since Wednesday morning on a truck-driving assignment, and when he arrived that night, their vehicles were there and the house door was locked, but things were missing and bullet holes were in the house. Bob said that he last talked to his wife on Thursday morning. Bob listed the missing items, including his wife's recliner. Waggoner noticed two bullet holes in windows

and two bullet holes in a gun cabinet, and several drawers were emptied onto the floor in one room, but the rest of the house appeared untouched. There was no sign of forced entry. Waggoner felt something was not right, so he called his supervisor. Detective Conner agreed with Waggoner's assessment.

The next day, Saturday, law enforcement officers recorded an interview with Bob, wherein Bob related his truck-driving activities in detail from Wednesday to Friday and said that he met his stepdaughter Dee at a casino in Oklahoma for dinner on Thursday night at her request. He said that Dee was back at the family's ranch property when he returned on Friday night; Dee was at that time living in a trailer on the acreage. Bob's theory at that point was that someone must have hit Polly on the head and taken her.

Dee was at the Devor family ranch on Saturday, June 16, 2007, but she was not a suspect at that time. Two of Bob's guns were recovered from Bill Underwood on Sunday, June 17, and a stolen truck was left on the property. Underwood said that Dee delivered the guns to him on Saturday and that she was driving that truck, which had also been reported stolen. Dee became a person of interest at that point.

Law enforcement learned that Polly filed a police report on June 12, 2007, stating that someone had stolen her credit card and charged approximately $1500 in cash advances on it between June 10–12. An arrest warrant was issued for Dee on June 21 for theft by receiving, concerning the stolen truck and guns.

Investigators spoke to Bob again on June 26, but Bob denied knowing where Dee was. He said he had heard rumors that she might be in Mexico, which he thought might have been said by one of his daughters. Bob said he did not believe Dee's disappearance had anything to do with Polly's disappearance. Bob said he heard rumors that Polly was in a fight with his biological daughters or perhaps Polly had been shot. He could not confirm the source of the rumors. Bob said he knew of no reason Polly would have problems with Dee, and he did not think Dee was capable of hurting Polly. In speaking about Bob and Polly's rental properties and cash flow, Bob said if he had to "dig her back up," he would put Polly in charge of the rentals.

On June 29, Bob told investigators that he had heard another rumor that Polly and Dee were dead in Oklahoma and a rumor that Polly was dead by the river. He did not provide the source of those rumors.

Law enforcement learned that Dee had been in Mississippi, that she had taken money and a vehicle from Bob for the trip, and that Bob wired money to Dee for her return. Law enforcement ended up finding Dee at the ranch house on June 29, 2007.

Dee moved into the Devor ranch house with Bob within a month of Polly's disappearance. In November 2007, the Devor property was searched for spent shell casings outside the Devor home. While law enforcement officers were present, Bob became irate and stated that he would have to solve Polly's case himself. Bob then said that about a month prior, two or three men came to him to sell him back one of his stolen guns and sought reward money regarding Polly's disappearance, but he backed them down by putting a straightrazor to one of their throats and pointing a gun at them. He said he bought his gun back and was informed that Polly's recliner had been dumped in Russellville. Because Bob kept changing the facts of the story, like how many men were there and how much he paid to get his stolen gun back, detectives thought Bob's story made

no sense. Nevertheless, detectives tried to follow up on this information, but it went nowhere.

In July 2008, Bob told his November 2007 story to different detectives. This time, Bob said there were two white guys in a car who drove to his house looking for reward money, but because Bob challenged them with a straight-razor and pistol, they ended up just giving Bob's gun back and driving away. Bob added that they told him Polly's recliner was in a dumpster in Russellville or Clarksville.

Months went by, and the investigation into Polly's disappearance grew cold. In early 2009, Monica was arrested on other charges. She became a State witness in exchange for immunity. Monica wore a recording device and met with Dee at a Wal–Mart parking lot on April 13, 2009; Dee was driving Polly's Cadillac. In their conversation, Dee encouraged Monica to stick to their story; to seek out Bob so that he could hire Monica a private attorney; not to worry that law enforcement might find a ring because she (Dee) "took it off"; not to worry because no one knew they were on the bridge, "not even my dad"; not to worry because it had been two years and the river had risen many feet; and not to give in to pressure to make a deal with the prosecutors.

Monica directed law enforcement to the dumping area on the Devor property where burnt dental crowns and bone fragments were found. A search of the Devor home was conducted on April 14, 2009; a greeting card from Bob to Dee was found in Dee's bedroom. It read, "I'll never tire of playing with fire as long as that fire is you," signed, "I love you, Bob." When opened, the card plays, "Ring of Fire," by Johnny Cash.

On April 22, 2009, Bob gave another statement to investigators in which he was asked about Monica and whether he had contact with her. Bob expressed concern he would be accused of burying something, that he had a machine that could dig thirty feet deep, and that he had been digging and burying things for forty years.

In early 2010, Dee's jail cell was searched, and two Valentine cards from Bob were found. One card was postmarked from Bob to Dee on February 9, 2010, and it read, "Valentine, If Loving You is a Crime . . . then throw my happy ass in jail!" The other card, also signed by Bob, was titled, "I Love You When . . . A Booklet Meant Just For You," and it contained the following: "I love you when my hormones tell me that I'm 'in the mood' . . ." While Dee was in custody, Bob called Dee hundreds of times and visited her weekly. Bob was arrested for hindering apprehension or prosecution around the same time that Dee entered her guilty plea in August 2010 to murdering her mother.

Bob testified at trial, stating that he knew Dee was leaving town that Sunday, June 17, that he gave her $200, and that he knew she was going to Mississippi. He said he did not recall law enforcement asking him where Dee was, but he remembered telling them that he did not think she had "run." Bob said Dee never told him she was involved in Polly's disappearance until after her arrest for murder. Bob denied having any sexual relationship with Dee. He claimed that he bought the "Ring of Fire" card because he liked Johnny Cash's song. He remarked that the Valentine card he sent to Dee was just his way of giving law enforcement something to talk about in their meetings.

Gene Partlow, a resident of Siloam Springs, testified that he was a friend of Dee's, that they did drugs together, and that he sometimes worked with her because he is a paint contractor. Gene said Dee came to Mississippi to work with him

in the summer of 2007. Gene also testified that he walked into Dee's trailer one time and caught Dee and Bob "hugging and kissing." Gene explained that the kiss involved tongue and was "more than a father-daughter kiss."

Monica, who said she was Dee's methamphetamine dealer, testified at trial that she and Dee killed Polly on June 14, 2007, after which they searched Polly and Bob's house for money and prescription drugs. She denied they shot a gun inside the house. Monica said that the motive was Dee's hatred of her mother for reporting the stolen credit card. Monica testified that Bob was to put Polly's remains in a hole and clean up the site with a tractor. Monica recalled Dee speaking to Bob on the telephone while they were driving away from Siloam Springs that Thursday, that Dee was very upset during that conversation, and that Dee and Bob met up at the casino that night. Monica said they returned to Siloam Springs on Sunday, Dee told Bob she had to leave, and Bob gave Dee money and a vehicle to drive. Monica believed Dee and Bob to have an inappropriate sexual relationship.

Dee testified at trial that she was serving her sentence for first-degree murder. Dee said Monica was her friend because they used drugs. Dee had hard feelings toward her mother, who she said had a gambling problem. Dee explained that Monica brought Polly to the dump area that day, Dee tried to shoot her, Monica hit her in the head, Dee retrieved another gun to shoot Polly, and they worked together to burn Polly's body. Dee said she called Bob to tell him the job was done, although she said that meant bush-hogging she had completed at the ranch. Dee said Bob met her at the casino in Oklahoma that night for dinner. She agreed she left town Sunday, June 17, with money and a vehicle Bob gave her, went to Mississippi

for about ten days, and returned to the family's ranch. Although she had at first told investigators that she did not know where she was going, at trial she said she was going to see if a painting job was available in Mississippi. Dee said she did nothing to the ranch house to make it look like a burglary took place. Although she told investigators earlier that she and Bob had a sexual relationship, Dee denied it at trial.

The jury was instructed to decide whether the State had proved beyond a reasonable doubt:

First, that Bob Devor provided or aided in providing [Dee] with a weapon, or money, or transportation, or disguise, or other means of avoiding apprehension, or avoiding discovery or effecting escape, or lied, or attempted to provide erroneous information, documents, or other instrumentalities which he knew to be false to a certified law enforcement officer that detracted from the true course of the investigation or inhibited the logical or orderly process of the investigation. And second, that Bob Devor so acted with purpose of hindering the apprehension, prosecution, or conviction, or punishment of [Dee] for an offense.

In making that decision, the jury was instructed that Dee and Monica were accomplices such that Bob could not be convicted on their testimony unless it was corroborated by other evidence tending to connect Bob with the commission of hindering apprehension or prosecution.

On this evidence, the jury rendered a guilty verdict. This appeal followed. In considering this appeal, we recognize that the State charged Bob with having the purpose to hinder apprehension or prosecution of Dee when he provided Dee with money and transportation to leave the area, or when he lied or provided false information that would distract from

or inhibit progress in the investigation, either of which would suffice for a conviction. Ark.Code Ann. § 5–54–105(a)(2) & (a)(7) (Repl.2005). The statute focuses on the actor's purpose to hinder apprehension or prosecution rather than certainty as to his knowledge of the committed crime. *Workman v. State,* 267 Ark. 103, 589 S.W.2d 20 (1979) (statute specifies hindrance with regard to "an offense" and not a particular offense).

Here, Bob admits that he gave Dee money and a vehicle but asserts that this was typical for him to provide those things, so the State failed to prove that his purpose in doing so was to assist Dee in avoiding apprehension or discovery or in effecting escape. Bob contends also that he provided law enforcement with rumors he had heard, but there was no evidence of their falsehood, nor was there evidence that he gave that information for the purpose of hindering Dee's apprehension or prosecution. Bob argues, too, that the State failed to corroborate the testimony of the accomplices (Dee and Monica), rendering the State's proof insufficient. *See Riley v. State,* 2009 Ark. App. 613, 343 S.W.3d 327 (test requires that accomplice testimony be excluded and that other evidence independently establishes the crime and corroboration evidence "tends to connect" the defendant with it). We disagree that the State's evidence is insufficient to sustain the guilty verdict.

Bob was accused of hindering Dee's apprehension or prosecution, not murder.[1] Focused on that crime, the jury was presented evidence and testimony—excluding Monica's and Dee's testimony—that: (1) Bob admitted that he met with Dee at a casino on Thursday night prior to arriving home on Friday, June 15; (2) Bob denied knowledge of Dee's whereabouts to law enforcement in the days following Polly's disappearance; (3) Bob admitted at trial to providing Dee with money and a vehicle to effect her travel from Arkansas to Mississippi in that period of time; (4) Bob offered various rumors and inconsistent stories to law enforcement about what might have happened, and who might be involved, throughout the remainder of the investigation; (5) Bob made repeated references to Polly being hit in the head, shot, in the river, and buried when he purportedly had no knowledge of Polly's death or how it happened; and (6) Bob had a strong and questionable affection for Dee that might account for his motive to hinder her apprehension or prosecution. The jury was permitted to draw upon its common knowledge and experience and to infer intent from the circumstances; it was not required to believe Bob's version of events because Bob was the person most interested in the outcome of the trial. *Springston v. State,* 61 Ark.App. 36, 962 S.W.2d 836 (1998).

For the foregoing reasons, we affirm.

PITTMAN and GLOVER, JJ., agree.

---

1. We question whether Dee's and Monica's testimony needed to be corroborated. They were clearly accomplices in Polly's murder, but Bob was never charged with murder, as a principal or accomplice. Hindering apprehension or prosecution can only arise when a crime has already been committed. *See Hopes v. State,* 306 Ark. 492, 816 S.W.2d 167 (1991); *Tyler v. State,* 265 Ark. 822, 581 S.W.2d 328 (1979); *Ritchie v. State,* 31 Ark. App. 177, 790 S.W.2d 919 (1990). Whether Dee and Monica could be Bob's accomplices in hindering Dee's apprehension or prosecution is unclear. In this case, however, all parties proceeded under the theory (and the jury was instructed) that Dee and Monica were accomplices whose testimonies had to be corroborated to support a conviction against Bob, so we do as well.